UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

---

TONYA HAUKAAS,                                              Civil No.: 20-4061

     Plaintiff,

     vs.

LIBERTY MUTUAL INSURANCE
COMPANY,

     Defendant.

---

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S SECOND MOTION TO COMPEL AND AFFIRMATIVE MOTION FOR
PROTECTIVE ORDER**

---

## INTRODUCTION

Without conducting any substantive affirmative discovery on the underlying issues in this case, Plaintiff seeks unprecedented "bad faith" discovery through this second motion to compel. Specifically, Plaintiff's motion demands (1) information from corporations that conduct no business related to workers compensation insurance (and, in some cases, no business related to claims adjustment at all) merely because they are affiliated with Liberty Mutual Insurance Company; (2) ten years' worth of bad-faith claims from Liberty Mutual, regardless of any tie whatsoever to the jurisdiction or the "pattern and practice" alleged in the complaint; and (3) *every single* IME that has been performed on behalf of Liberty Mutual in that same time span.

Plaintiff makes these demands without any real effort to compromise, knowing that these requests are not only irrelevant to the issues of this case, recognizing the burden of responding to them is by no means proportional to the needs of the case, and knowing that responding to the IME

request is essentially impossible.  Not only should Plaintiff's motion be denied, the Court should grant a protective order banning Plaintiff from its continued efforts to "shake down" Defendant with unduly expensive and time-consuming discovery requests.

## STATEMENT OF FACTS

Although one might not recognize it by the discovery requests at issue in this motion (which seem more akin to discovery sought in a class action), Plaintiff's motion begins by noting that this case is, in fact, about an injured worker and future benefits that were denied as a result of an independent medical examination performed by Dr. Jeffrey Nipper. (Dkt. #37 at 1-2).[1]  Those benefits, it is undisputed, were immediately reinstated after an administrative law judge determined the injury was work-related, and found the opinions of Dr. Lawlor, as Plaintiff's treating physician, to be more compelling than those of Dr. Nipper (although the judge found both doctors' opinions to be credible). (Dkt. #18-16 at LM001935).

Because Plaintiff received all the contractual benefits to which she was entitled through the administrative action (which was globally settled shortly thereafter), the sole cause of action in this lawsuit is one for bad faith.  In her Complaint, Plaintiff asserts in relevant part:

> 19. On September 24, 2015, Haukaas was seen by Dr. Jeffery Nipper, an orthopedic surgeon, for an "independent medical examination" at the request of Liberty Mutual.
>
> 20. Dr. Nipper is known to have a close relationship with insurance companies and routinely provides insurers with biased medical opinions.
>
> 21. Dr. Nipper has testified that he performs at least five "independent medical examinations" per week, which results in a minimum of 250 per year, for insurers and their attorneys.

---

[1] As used herein, all references to "Dkt." Refer to the docket number of documents previously filed in this case.  References to "Decl." refer to the various declarations filed concurrently herewith, and all references to "Ex." refer to documents attached to the Declaration of Daniel W. Berglund.

22. Upon information and belief, Dr. Nipper overwhelming renders opinions in favor of insurers and their attorneys when he performs "independent medical examinations."

23. Liberty Mutual knew, or should have known, that Dr. Nipper regularly and routinely provided opinions to insurance companies that reduce the insurer's claim payments, and that he was predictably biased in favor of the party retaining his services.
…

46. Liberty Mutual breached its duty of good faith on numerous occasions including, but not limited to, the following:

    (a) Denying benefits to Haukaas without a reasonable basis;

    (b) Hiring a doctor to conduct an IME knowing or having the ability to know that the doctor was biased in favor of insurance companies; and

    (c) Denying workers' compensation benefits to Haukaas when her claim was not fairly debatable and Liberty Mutual knew or should have known that her claim was not fairly debatable.

47. Upon information and belief, Liberty Mutual's conduct is part of a pattern of conduct of using biased IME doctors like Dr. Nipper to provide biased reports as a basis to deny legitimate claims and reduce claim costs.

(*See generally* Complaint at ¶¶19-47).  Put simply, the "bad faith" alleged is the retention of Dr. Nipper, his purportedly routine providence of biased opinions, and the alleged "belief" that Liberty Mutual has a "pattern and practice" of relying upon doctors like Dr Nipper to deny claims.

## A.  Discovery and Procedural History

This Court will likely recall that an original scheduling order was issued in this case on May 21, 2020. (Dkt#13). While the original order was in effect, Plaintiffs served "bad faith" discovery requests, which included, in addition to all documentation related to this specific claim, expansive inquiries into Liberty Mutual's claims-handling practices, incentive programs, personnel files and other documentation that, if a pattern and practice were to exist, would expose

the "motive" for any such conduct.  (*See generally* Ex. 1).  The original requests also included a specific request for all IMEs previously performed by Dr. Jeffrey Nipper on behalf of Liberty Mutual, and Liberty Mutual provided them. (*Id.* at pp. 4 (Interrogatories 6, 7); p. 9 (Request for Production 18)).

In that original scheduling order, Plaintiff's expert disclosure deadline was November 16, 2020.  Plaintiff, pursuant to that order, disclosed the identity of "various medical personnel" who would "testify regarding the medical care and treatment that they provided to the Plaintiff, the reasons why the care was provided, the cause of the Plaintiff's injuries, the future care needed and their clinical findings." (Ex. 2).  Plaintiff did not disclose any "bad faith" or claims-handling expert, nor did she reserve the right to add such opinions or have any discussions with Defendant at that time about extending expert deadlines or adding opinions at a later date.[2]  (*Id.;* Berglund Decl., ¶ 4).

Knowing that Plaintiff's counsel has already prosecuted several cases by simply presenting evidence of a doctor's diagnosis rate in "favor" of insurers,[3] and seeing that the lack of any expert opinion in this case suggested that counsel would be doing it in this case as well, Liberty Mutual engaged Dr. Brian McCall to provide expert testimony refuting counsel's historical argument that percentage alone should be considered.  Dr. McCall opined, by a report served on opposing counsel

---

[2] The Court will recall that the first motion to compel had been filed before this disclosure, so if Plaintiff truly needed the compelled discovery to add affirmative expert opinions she would have so stated in her disclosures or at the very least communicated such an intent at the time.

[3] *See, e.g., Muharemovic v. Lincoln National Corporation et al.*, 4:20-cv-04069-KES; *Olson v. Depositors Insurance Company*, 4:19-cv-04130-KES; *Skidmore v. Atlantic States Insurance Company*, 4:20-cv-04189-KES; *Witt v. National Union Fire Insurance Company of Pittsburgh, PA, et al.*, 5:19-cv-05004-KES.

on December 28, 2020, that any such evaluation must be done in comparison to an "appropriate population":

> One cannot determine whether a certified medical doctor is biased towards making a particular diagnosis when conducting an independent medical exam (IME) like, for example, concluding that the patient they examine can return to work just because the fraction of times the doctor makes this type of diagnosis is large. What needs to be determined first is the fraction of times certified medical doctors conducting IMEs in similar circumstances would make the same diagnosis. Once this is accomplished, the fraction of times the particular doctor under scrutiny makes this diagnosis can be compared to this population fraction to determine whether any statistical evidence exists as to whether this doctor makes this type of diagnosis more (or less) frequently than usual. … To determine whether Dr. Nipper's conclusions from conducting an IME exhibit any bias his conclusions need to be compared to the conclusions from a random sample of IME reports conducted by other physicians on individuals with similar types of conditions to those examined by Dr. Nipper where the IME was conducted after a similar amount of time has elapsed between the date of reported occurrence of the injury and the date of the IME. A statistical analysis would then be performed in order to assess whether the fraction of time Dr. Nipper makes a particular conclusion is statistically significantly different from the fraction of time other physicians conducting IMEs make the same conclusion.

(Dkt # 38-12 at pp. 1-2) (emphasis added).  In other words, Dr. McCall stated that Plaintiff must present some evidence of what an *appropriate* percentage of diagnoses supporting or rejecting a claimant's claimed injury would be for a doctor to be considered "unbiased."

In direct response to Dr. McCall's report, Plaintiff's counsel first attempted to revise the scheduling order to allow him to submit an additional affirmative report.  (Ex. 3).   After Defendant's objection, Plaintiff's counsel then suggested he intended to "supplement" his original expert reports without amending the expert disclosure deadline. (Exs. 4, 5).  Ultimately, Plaintiff's counsel submitted a "supplemental" report of Dr. Lawlor, which does not actually "supplement"

any prior opinions but instead provides an entirely novel opinion that in his experience, "insurance companies" force doctors to write biased opinions. (Ex. 6, Dkt. #38-13 at pp. 3-4).

And while this exchange regarding experts was ongoing, Plaintiff also propounded her second set of discovery which is the subject of the current motion. Those requests included (1) financial and other corporate information from all Liberty Mutual affiliated entities worldwide, regardless of whether they were involved in handling workers compensation files (or insurance adjustment at all), (2) ten years' worth of information related to *allegations* of bad faith, without consideration of jurisdiction and regardless of whether the conduct alleged was similar to the conduct alleged here, and (3) *all* IMEs performed for Liberty Mutual in the past ten years. (Dkt#38-1).

## MEET AND CONFER STATEMENT

Liberty Mutual generally agrees with Plaintiff's statement that the parties met and conferred in good faith, that Plaintiff has declared an impasse because Liberty Mutual has been unwilling to comply with the requests as drafted, and that the parties exchanged eight letters in the meet-and-confer exchange leading up to the present motion. It notes, however, that it appears Plaintiff only included seven of those eight letters in its submissions to the Court, attaching a June 17, 2021 cover letter for Liberty Mutual's amended discovery responses instead of Liberty Mutual's June 10, 2021 response to Plaintiff's third meet-and-confer letter of May 25, 2021. Liberty Mutual therefore includes that letter so the Court better understands the full conflict and the parties' respective positions. (Ex. 7).

Liberty also notes that although the parties did, in fact, confer about the three outstanding discovery issues, at no time did Plaintiff ever state that the financial reports provided by Liberty

Mutual were "indecipherable," and this argument is being raised for the first time though this motion.  (*See* Dkt#38-4 – 38-11; Ex. 7).

## ARGUMENT

In the nearly seventeen months since this case has incepted, and in the (more than a) year that Plaintiff sent her first set of discovery to Plaintiff, Plaintiff has conducted no further discovery on the claim itself and no depositions other than that to ensure that all electronic data has been preserved.  Instead, Plaintiff has focused all attention on issuing wide-ranging and intrusive "bad faith" discovery demands that at first blush *appear* to be tenuously supported by prior case law but, in fact, are far broader than any demand previously made by any Plaintiff's counsel in prior bad-faith litigation (while providing far less support to justify the need for them).

At some point, discovery turns from a tool used for litigation to one used for abuse.  As noted in *State Farm v. Superior Ct.*, a case involving similarly broad-ranging (but tenuously relevant) discovery requests:

> Without some limitation in space and time, this discovery is so overbroad as to generate gigantic paper searches with little prospect of finding anything of significant relevance. A party targeted by such a demand could well be tempted to settle a meritless claim rather than incur such effort and expense. This kind of coercive settlement, which occurs with some frequency, is a serious indictment of our civil justice system.

804 P.2d 1323, 1327 (Ariz. Ct. App. 1991).

Here, Plaintiff's efforts to seek discovery related to (1) corporate entities that have no relation to this dispute, (2) bad-faith discovery involving claims unrelated to workers compensation or the entities or adjusters involved in this dispute, and (3) the results and documentation of *all* IME performed on behalf of Liberty Mutual, without any meaningful effort to compromise on any of these issues, are not reasonable, nor are they proportional to the needs of

the case.  Plaintiff's motion should be denied and an order granting protection from this abuse should be granted.

### A.    Discovery standard

Rule 26(b) of the Federal Rules of Civil Procedure is widely recognized as a discovery rule which is liberal in scope and interpretation, extending to those matters which are relevant and reasonably calculated to lead to the discovery of admissible evidence. *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992) (*citing Kramer v. Boeing Co.*, 126 F.R.D. 690, 692 (D. Minn. 1989)). While the standard of relevance in the context of discovery is broader than in the context of admissibility, *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978), "this often intoned legal tenet should not be misapplied so as to allow fishing expeditions in discovery." *Hofer*, 981 F.2d at 380. "Mere speculation that information might be useful will not suffice." *Frazier v. Farmers Mut. Ins. Co. of Nebraska*, No. 4:19-CV-04132-LLP, 2020 WL 3036361, at \*3 (D.S.D. June 5, 2020).

And although discovery is liberal in scope, the parties must always in conducting discovery consider whether the matter is relevant to any party's claim or defense *and* proportional to the needs of the case, appraising "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Vallejo v. Amgen, Inc.*, 903 F.3d 733, 742–43 (8th Cir. 2018) (*quoting* Fed. R. Civ. P. 26(b)(1)).  Indeed, "[t]he parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes." *Id.* (citing Fed. R. Civ. P. 26 advisory committee's notes to 2015 amendment). "[A] court can—and must—limit proposed discovery" that it determines is not proportional to the

needs of the case." *Id.* (c*iting Carr v. State Farm Mut. Auto. Ins., Co.*, 312 F.R.D. 459, 468 (N.D. Tex. 2015)).  Discovery is proportional and the less relevant discovery is to the heart of the case, the more the expense or work needed to produce the discovery weighs in the balance. *United States v. Morris, Inc.*, No. 4:14-CV-04131-LLP, 2016 WL 4098570, at \*5 (D.S.D. July 28, 2016).

Furthermore, the Court may limit discovery if it is cumulative or duplicative, unduly burdensome, or expensive, Fed. R. Civ. P. 26(b)(2)(C)(i), and has the authority to issue a protective order, upon a showing of good cause, to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). The order to protect the party may, among other things, forbid the requested disclosure or discovery, forbid inquiry into certain matters, or limit the scope of disclosure or discovery to certain matters. *Id*. at 1(A)(D). This Court has wide discretion in deciding whether to grant or deny a protective order." *Miscellaneous Docket Matter No. 1 v. Miscellaneous Docket Matter No. 2*, 197 F.3d 922, 925 (8th Cir.1999) (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984)).

### B.  The information sought on uninvolved entities will not lead to admissible evidence.

The first disputed set of discovery requests relates to Plaintiff's demands to produce financial and other corporate records related to *all* entities somehow affiliated with Liberty Mutual Insurance Company.  (Dkt#38-1 at p. 3 (Interrogatory 3), p. 5 (Requests for Production 3, 4)).  In support of her argument to compel this information, Plaintiff states that such information is necessary because Liberty Mutual has "repeatedly" stated that the First Liberty Insurance Company—not Liberty Mutual—is the proper defendant to this lawsuit,[4] and that it seeks to

---

[4] Although the motion suggests that Liberty Mutual maintains this position, in reality it is has effectively conceded through the various meet and confer correspondences and productions that, given its role in adjusting the claim, it likely could not be dismissed from the suit at this stage. (*See* Dkt#38-11 at p. 2).  Given that First Liberty actually provided the insurance at issue in this lawsuit, however, Liberty Mutual reserves its right to later move for dispositive relief on the issue.

explore the relationship between Liberty Mutual and its parents and subsidiaries to see if "Liberty is so intertwined with its affiliated companies that those parties are properly added to this cause of action." (Dkt#37 at 11).  But Plaintiff's Complaint does not plead veil piercing nor has Plaintiff produced any evidence in support of this theory; as such, this type of veil piercing discovery is irrelevant, nothing more than a fishing expedition, and should be denied. *See, e.g.*, *Alexander v. 1328 Uptown, Inc.*, No. 18-cv-1544 (ECT/ECW), 2019 WL 4929931, at *7 (D. Minn. Oct. 7, 2019).

And of course, Liberty Mutual has taken the position that First Liberty is the proper party to this lawsuit because it is the underwriting company for the policy under which this claim was made.  (Ex. 8).  And although employees of Liberty Mutual Insurance Company handled and adjusted the claim, they did so on behalf (and in the name of) of First Liberty, all premiums were collected by First Liberty, and all claims have been paid by First Liberty.  (*See id*.; Ex. 9).

But even accepting that Liberty Mutual Insurance Company should be named as a defendant in this action, Plaintiff has failed to respond to Liberty Mutual's repeated queries as to what facts—other than ownership—would implicate any parent corporations or other subsidiaries in the current action.  (*See, e.g.,* Ex. 7 at p.1; Dkt#38-11 at p.2).  Through Liberty Mutual's response to Plaintiff's first set of discovery requests, it has provided Plaintiff with all records related to the handling of this claim (including everyone who was involved with it), all claims handling guidelines, all employee records and all incentive programs.  Those records all show that Liberty Mutual Insurance Company employees—and exclusively Liberty Mutual Insurance Company employees—handle First Liberty claims.[5]  Once more, Liberty Mutual has provided

---

[5] The employee referenced in Plaintiff's brief as an employee of "Liberty Mutual Group" is actually an employee specializing in litigation holds for Liberty Mutual's legal department and has no involvement in claims handling.  She was called not because of any involvement in the claim,

amended responses to *these* discovery requests indicating that the ownership levels above Liberty Mutual Insurance Company (Liberty Mutual Holding Company and Liberty Mutual Group, Inc.) are holding companies with no employees involved in claims handling and providing no funding to subsidiary corporations. (Dkt#38-3 at p. 6; *see also* Ex. 7 at p. 2). In short, Plaintiff is already aware that the parent corporations have no "control" over claims handling or the day-to-day operations of Liberty Mutual.[6]

Moreover, Plaintiff has failed to provide any explanation whatsoever as to why it would be required to provide corporate information for entities that, although subsidiaries of Liberty Mutual, have no role in the handling of this or any other workers compensation claim.[7] Liberty Mutual has provided Plaintiff with an organizational chart of all Liberty-affiliated subsidiaries—all of which (besides First Liberty) are uninvolved in this claim, almost all of which are uninvolved in handling workers compensation claims, and none of which have employees that handle or control the claims handling of other organizations—and explained that information from these entities would not have relevant information or lead to admissible evidence. (*See* Ex. 7 at 1-2, 7-11). Liberty Mutual repeatedly requested that Plaintiff attempt to limit the scope of the requests or to find some sort of

---

but because she was most knowledgeable about Liberty Mutual's litigation holds, a requested topic in Plaintiff's 30(b)(6) deposition notice. (Ex. 10 at ¶¶ 4-8). Similarly, the employee who identified himself as an employee of "Liberty Mutual Technology Group" is a member of Liberty Mutual's tech support team who was called for his knowledge of email retention, not because of any involvement in this or any other claim. (*Id*. at ¶ 9; Ex. 11 at 9-12).

[6] Liberty Mutual amended its interrogatory answers to explain the corporate structure in a manner that it believed would satisfy Plaintiff's concerns but Plaintiff responded to those amended answers by declaring they were "obviously not what we requested" without further explanation. (Dkt#38-10 at p. 1).

[7] Plaintiff's arguments that they need to "explore" whether other entities may also act in the same manner, without any support for them, makes her discovery more akin to that designed for a class action, rather than a lawsuit involving an individual denial.

compromise, but each request was rejected, and Plaintiff has insisted on full compliance, no matter how tenuous the relationship of the demanded discovery is to the allegations of the complaint (again, none of which contain any allegations of veil-piercing). (Dkt#38-5 at 1-2; Dkt#38-6 at 1-2; Dkt#38-7 at 1-2; Dkt#38-8 at 1; Ex. 7 at 1-2; Dkt#38-10 at 1; Dkt#38-11 at 1-2).

But perhaps most importantly of all, Plaintiff has failed to articulate what "injustice" might exist if First Liberty (or Liberty Mutual) is the only named defendant.  Indeed, Plaintiff's argument overlooks that the evaluation Plaintiff has articulated in *Glanzer v. St. Joseph Indian School* is actually a *two*-prong analysis. 438 N.W.2d 204, 207 (S.D. 1989).  Only when "retention of corporate separateness would produce injustices and inequitable consequences" should a court consider whether the so-called "instrumentality exception" should apply.

Indeed, as a general rule, a parent corporation is not liable for the tortious acts of a separate subsidiary corporation. *Bollwerk v. Susquehanna Corp.*, 811 F. Supp. 472, 477 (D.S.D. 1993). The corporation is looked upon as a separate legal entity until there is sufficient reason to the contrary. *Mobridge Cmty. Indus., Inc. v. Toure, Ltd.*, 273 N.W.2d. 128, 132 (S.D. 1978). "Sufficient reason," under South Dakota law, contemplates unfairness, injustice, fraud, or other inequitable conduct as a prerequisite. *Kansas Gas & Elec. Co. v. Ross*, 521 N.W.2d 107, 112-13 (S.D. 1994). Furthermore, it is well settled that simply having common employees, directors, or officers is not sufficient to pierce the corporate veil to "render a parent automatically answerable for the acts of its subsidiary." *Satellite Cable Servs., Inc. v. N. Elec. Co-op., Inc.*, 1998 S.D. 67, ¶ 13, 581 N.W.2d 478, 482 (S.D. 1998).

As Plaintiff is aware, the policy at issue in this case was underwritten by First Liberty, so any contractual or quasi-contractual claim for relief should be against First Liberty as the company through which this claim was made. And as First Liberty's financial statements indicate, First

Liberty maintains separate assets, is more than adequately liquid, and can pay for any judgment that may be assessed against it here.[8] (*See* Ex. 12 at 3). And although Liberty Mutual still questions whether it is properly named to this lawsuit, it too has provided ample evidence that it could pay for any judgment assessed against it. (Ex. 13 at LM008790).

Put simply, Plaintiff has not presented an adequate justification for the invasive discovery it seeks because it cannot establish an "injustice" that would warrant it. Her effort to delve deep into the financial details of entities that have no involvement in this lawsuit, without any effort to limit the request or otherwise compromise, exceeds the scope of Rule 26 and should be rejected.

### 1.   Plaintiff has not previously communicated that Defendant's reference to financial statements is "indecipherable."

Plaintiff claims that Liberty Mutual's provision of what it calls "indecipherable" annual statutory filings, without noting the specific pages from the production that identify responsive information, does not sufficiently respond to her interrogatories regarding whether parents or subsidiaries are sufficiently "intertwined." (Dkt#37 at 10-11). As noted above, at no point during the parties' various meet and confers did Plaintiff complain about the complexity of these documents. If they did, Liberty Mutual could have further explained the response. Instead, Plaintiff stated that the responses were "not what [she] requested" without further explanation and, as a next step, moved to compel a response. (Ex. 38-10 at p. 1).

A cursory review of these documents, however, shows that these documents are relatively easy to "decipher." For example, in the most recent annual filing for Liberty Mutual, an overview

---

[8] Perhaps the actual basis for Plaintiff's motion is not to hold additional parties accountable, but to seek additional "pockets" from which to seek punitive damages.

of all assets and liabilities for that entity is listed on pages LM008790-91.[9] (Ex. 13).  An overview of all income and losses—and the sources of all income and losses—for 2020 and 2019 are listed on page LM008792. (*Id.*)  A further breakdown of the detail of that income and loss is provided in the subsequent pages, and then the notes provide even further detail.  (*Id*. at LM8793-8877).

Generally speaking, all income for Liberty Mutual comes from Liberty Mutual policy premiums, with some additional income from investments.  (*Id.* at LM008799).  Its employees are also paid directly through the company and are part of the company's expenses. (*Id*. at LM008799).  Liberty Mutual does not rely on, and receives no funds from, any parent corporation to fund or run its organization.  (*See generally id.*).

It therefore remains unclear what additional information Plaintiff seeks.  As Liberty Mutual has indicated in its various correspondences to date, however, it is willing to continue to work with Plaintiff in an effort to respond to this request in a way that is reasonable.  (*See* Ex. 7 at 2, Dkt#38-11 at p. 2).  Plaintiff's continued efforts to seek corporate and financial records from all Liberty Mutual affiliated entities, without a sufficient basis for it or any effort to compromise, is simply *not* reasonable.

### C.  The bad-faith information sought is not relevant, unduly burdensome, and not proportionate to the needs of the case

Similarly, Plaintiff's demand for the details of *all* bad-faith allegations for the last ten years from all Liberty Mutual-affiliated entities, regardless of jurisdiction or type of coverage, is well beyond any discovery previously compelled by this Court.  Although Plaintiff couches her

---

[9] Plaintiff notes in her brief that "it appears that Liberty files a consolidated tax document with numerous entities that Haukaas seeks to add as Defendants." (Dkt#37 at 9).  Although the broader Liberty Mutual organization *does* file such a publicly available document, as it is legally required to do, it provided Plaintiff with the annual statements of Liberty Mutual itself, which provides the information Plaintiff requested.  (*See, e.g.,* Ex. 13).

justification for such a production as one based on "precedent," in reality all decisions cited by Plaintiff are unpublished and based upon the specific facts of that particular case.

Indeed, this Court will likely recall the circumstances that led to the decision to allow discovery of all prior bad-faith litigation in *Lillibridge v. Nautilus Ins. Co.*, No. CIV. 10-4105-KES, 2013 WL 1896825, at *6 (D.S.D. May 3, 2013), the case Plaintiff most relied upon in support of in support of this motion. (Dkt#37 at pp. 11-12). Those circumstances are significantly different than those that have been presented here. First, the *Lillibridge* case was procedurally much further along than the instant case, and the plaintiff there, after two years, moved to compel after he had already presented substantive evidence to the court, with a supporting declaration and exhibits, that Nautilus:

> • encourages its claims examiners to conduct hasty and cursory investigations;
>
> • encourages its claims examiners to quickly close files, regardless of whether there is an ongoing dispute with the file;
>
> • improperly sets goals for its claims examiners to take a certain percentage of cases to trial each year;
>
> • does nothing to correct independent adjusters who conduct incomplete investigations; and
>
> • sets goals for its claims examiners to "find savings in claims handling."

(*See* Ex. 14 at pp. 12-13). Based upon the facts presented and the specific allegations made, the plaintiff argued, successfully, that this "pattern and practice" of improper claims handling was not limited to a certain type of claim and therefore Nautilus's disclosure of prior bad-faith claims should not be limited to certain types of losses. (*Id.* at p. 13).

Here, however, Plaintiff's bad-faith allegation is more narrowly tailored to the "pattern of conduct of using biased IME doctors like Dr. Nipper to provide biased reports as a basis to deny

legitimate claims and reduce claim costs." (Complaint at ¶ 47).  Liberty Mutual provided Plaintiff with all claims handling guidelines and incentive plans months ago, and despite that production, Plaintiff provides no support for the "institutionalized" bad-faith claims handling practices presented to the court in *Lillibridge*.[10]  As such, because the "pattern and practice" Plaintiff alleges in her Complaint is more limited in scope (and evidentiary support) than that *actually presented* in *Lillibridge*, the request for *all* prior bad-faith claims is not sufficiently tied to Plaintiff's claims or to any other facts or theories that Plaintiff has articulated to Liberty Mutual or this Court.

Plaintiff attempts to justify this abusive discovery with the argument that it is relevant to its claim for punitive damages. But this argument also fails. To be discoverable for the purposes of "punitive" damages, even Plaintiff's cited cases indicate that the "conduct must have a nexus to the specific harm suffered by the plaintiff." *Lyon v. Bankers Life & Cas. Co.*, No. CIV. 09-5070-JLV, 2011 WL 124629, at *15 (D.S.D. Jan. 14, 2011); *see also, e.g., Pettyjohn v. Kalamazoo Center Corp.*, 868 F.2d 879, 881 (6th Cir. 1989) (circumstances surrounding other claims or complaints must be "substantially similar" to the incident at issue for that discovery related to those complaints is reasonably calculated to lead to the discovery of admissible evidence); *Lohr v. Stanley-Bostitch Inc.*, 135 F.R.D. 162, 164 (W.D. Mich 1991); *State Farm v. Superior Court*, 804 P.2d 1323, 1326-27 (Ariz. App. 1991).  Plaintiff has provided no real explanation as to how she believes she is entitled to disputes involving claims handling that are completely unrelated to workers compensation, this jurisdiction, or the allegations at issue in this Complaint (other than articulating its hope that it might unearth some sort of broader pattern and practice that is

---

[10] Plaintiff also noticeably fails to cite any evidence in support of her assertion that "[i]t is widely known that Dr. Nipper has a close relationship with insurance companies and routinely provides insurers with biased medical opinions" in her opening brief (Dkt#37 at p. 2.).  Rather, this appears to be a commonly asserted claim by Plaintiff's counsel.  (*See* Ex. 15 at ¶ 22; Ex. 16 at ¶ 32)

unsupported by all of the documentation Liberty Mutual has already provided). Indeed, Plaintiff does not adequately explain how, say for the purposes of a hypothetical, bad-faith allegations related to the handling of a commercial hail claim in New Jersey by a different (but Liberty Mutual affiliated) company using different guidelines and subject to different laws would have any bearing on Liberty Mutual's retention of IME doctors.[11]  *See, e.g, Baker v. CNA Ins. Co.*, 123 F.R.D. 322, 329 (D. Mont. 1988) (denying plaintiff's effort to compel bad-faith discovery where Plaintiff failed to establish "sufficient similarity" between "the obligations imposed by the law of Montana and the obligation imposed by the law of any particular jurisdiction to warrant discovery of information relating to litigation from a jurisdiction other than Montana.").

Moreover, and again unlike *Lillibridge*, Liberty Mutual has repeatedly articulated the immense burden of providing a response to this interrogatory as drafted.[12]  (Dkt#38-5 at p.3; Dkt#38-7 at p.2; Ex. 7 at pp. 3-4; Dkt#38-11 at p.3).  Liberty Mutual does not internally track what lawsuits include claims of bad faith, nor do they have a computerized coding system where the

---

[11] If indeed it is Plaintiff's position that *any* bad faith allegation—regardless of the type of claim or underwriting company—is "relevant to punitive damages," then Liberty Mutual also objects that such an unlimited request would essentially be re-litigating matters that have already been resolved, one way or another, in another jurisdiction. Liberty Mutual should not be subject to what is effectively a civil version of double jeopardy. *See, e.g., In re "Agent Orange" Prod. Liab. Litig.*, 100 F.R.D. 718, 728 (E.D.N.Y.1983) ("There must…be some limit, either as a matter of policy or as a matter of due process, to the amount of time defendants may be punished for a single transaction."), *aff'd*, 818 F.2d 145 (2d Cir.1987), *cert. denied*, 484 U.S. 1004 (1988); *In re "Dalkon Shield" Prod. Liab. Litig.*, 526 F.Supp. 887, 899 (N.D.Cal.1981) ("A defendant has a due process right to be protected against unlimited multiple punishment for the same act."), *vacated on other grounds*, 693 F.2d 847, 852 (9th Cir.1982), *cert. denied*, 459 U.S. 1171 (1983).

[12] The Plaintiff in *Lillibridge* also argued that the disclosure of such information was not overly burdensome because Nautilus was not one of the "behemoth" national insurance companies. (Ex. 14 at 17). Similarly, the defendant in Lyon (Banker's Life) has a limited portfolio of business, focusing on life and healthcare insurance. (Ex. 17). By contrast here, Liberty Mutual is one of the nation's largest insurers, providing virtually every type of insurance available, so responding to this request is indeed overly burdensome by shear case volume alone.

specific dispute and resolution of these types of claims can easily be identified and tracked, making this process arduous, costly and time consuming. (Townsend Decl. at ¶¶ 7-10). Specifically, in order to respond to this Request as drafted, Liberty Mutual would need to retrieve and review the approximately 26,000 claim files that were submitted to its home office legal department for litigation oversight[13] to first determine whether a bad faith claim was even alleged, and then to determine its outcome. (*Id.* at ¶¶ 9-10). Thus, even assuming the process of reviewing an entire claim file to locate and provide responsive information only took a half hour, a modest estimate, this process of locating and providing responsive information would take more than <u>13,000</u> hours to complete. (*Id.* at ¶ 9).  Thus, unlike *Lillibridge*, where the information was "not difficult to identify and produce," here Plaintiff's request would be nearly impossible.[14] (Ex. 14 at pp. 17-18). *See, e.g., Lureen v. Holl,* No. 4:17-CV-04016-LLP, 2017 WL 3834739, at *5 (D.S.D. Aug. 31, 2017) (denying a motion to compel response to a request for all allegations of sexual harassment

---

[13] Plaintiff in her brief states that it "is unclear…why Liberty has not sought to obtain this information about other bad faith claims from their litigation office." (Dkt#37 at 17).  Apparently Plaintiff does not understand that the obstacles articulated in Liberty Mutual's meet and confer letters involve the claims that *were* sent to the "litigation office." (Dkt#38-11 at 3; Townsend Decl. at ¶ 9).  Indeed, the burden described in this response brief specifically contemplates the input and assistance of Liberty Mutual's home office legal department overseeing bad-faith claims. (*See* Townsend Decl. at ¶¶ 7-10).

[14] Plaintiff states in her brief that she has been willing to retain a forensic consultant to assist in retrieving this information.  (Dkt#37 at 15).  But this is clearly an empty offer, as Plaintiff must certainly be aware that Liberty Mutual for any number of reasons (including, but not limited to, various state data privacy laws and confidentiality agreements related to settled matters) cannot simply hand over thousands of unredacted files, containing confidential health and personal information of insureds uninvolved in this action and attorney-client and work-product protected documents, to a third-party forensic consultant to review to evaluate each files' respective allegations and resolutions.   Moreover, because the requests seek details about the claim and its resolution, any forensic consultant would need to conduct the same claim file review that Liberty Mutual would need to review.  (*See* Townsend Decl. at ¶ 9).  Plaintiff cannot reasonably suggest she would be willing to actually incur that kind of expense.

"that encompasses 44,000 restaurants all over the world and encompasses a 10-year period," and noting that "[n]ationwide discovery is not available….. absent a class action or some <u>specialized showing</u> of a pattern or practice of discrimination at a level higher than the plaintiff's employment unit"); *Kaufman v. Nationwide Mut. Ins. Co.*, No. CIV. A. 97-1114, 1997 WL 703175, at \*2 (E.D. Pa. Nov. 12, 1997) (noting that, in denying motion to compel information on prior bad faith cases involving "totally different facts and circumstances from those present here," the "burden and expense of producing this information outweighs the likelihood of finding relevant material."); *State Farm Mut. Auto. Ins. Co. v. Stephens*, 425 S.E.2d 577, 584-585 (W. Va. 1992) (denying efforts to compel nationwide bad-faith history where the supporting affidavit described overwhelming burden to comply, and noting that "[i]n a number of cases, courts have refused to compel discovery where the requested information was less extensive than the interrogatories involved in this case.") (*citing State Farm v. Superior Court*, 804 P.2d 1323 (Ariz. Ct. App.1991); *Mead Reinsurance Co. v. Superior Court*, 232 Cal.Rptr. 752 (Cal. Ct. App. 1986) (declaring manual review of 13,000 files "oppressive"); *Leeson v. State Farm*, 546 N.E.2d 782 (Ill. Ct. App. 1989) (finding that an interrogatory requesting all independent medical examinations for a single year from a single office was "oppressive"); *and Bankers Life & Casualty Co. v. Miller*, 502 P.2d 27 (Mont. 1972) (finding interrogatory requesting all denials in the state over three years, "which can only be compiled after many thousands of hours of work at a considerable cost," to be unreasonable when weighing the burden to the value of the information sought)).

Finally, it should be noted that in *Lillibridge,* Nautilus failed to meet and confer in any meaningful way and rejected any overture on the part of plaintiff to compromise on the issue. (Ex.

14 at 9).  By contrast here, Liberty Mutual has indicated that the files[15] submitted to the home office legal department <u>can</u> be tracked by jurisdiction and as a compromise has offered to provide a response involving a more limited area closer to South Dakota, which would significantly ease the burden of this response.  (Dkt#38-11 at 3).  Plaintiff has been steadfast in her refusal to accept any compromise and insisted on full compliance.  It is unclear why Plaintiff would not agree to such a compromise, because if indeed some broader "pattern and practice" existed, surely Plaintiff would be able to discern it from a more reasonable sample size.

### D.  The Court should deny the IME discovery Plaintiff seeks

Finally, after first demanding only the IMEs conducted by Dr. Nipper, Plaintiff now seeks information related to *every* IME that Liberty Mutual has had performed on its behalf for the last ten years, an enormous request given the size of the Liberty Mutual organization.  (Dkt#38-1 at p. 4 (Interrogatories 5, 6); p. 5 (Request for Production 8)).  But Plaintiffs have not provided a justification for this information that outweighs the overwhelming burden the disclosure of this unrelated, highly sensitive information would place on Liberty Mutual.  In fact, they have provided no meaningful justification at all.

### 1.  The information sought does not assist Plaintiffs in rebutting Dr. McCall's opinions.

As an initial matter, and as the Court can see in the report of Dr. McCall itself, the additional IMEs that Plaintiff demands will do nothing to refute the report's conclusions.  The whole point of Dr. McCall's report is to reject the notion that a 90 percent finding "favorable" to

---

[15] Liberty Mutual notes that during this ten-year timeframe Liberty Mutual and its subsidiaries have adjusted millions of claims. Thus, although at first blush 26,000 litigation-supervised files may appear to be a large number, it is a small fraction of Liberty's overall case volume and any bad faith claims contained in those files would not, therefore, be indicative of some widespread "pattern" of bad-faith conduct.

insurers is evidence of bias *at all,* and to note that Plaintiff has not ever identified what a "proper" percentage should be.  (Dkt#38-12 at 1-2).  Indeed, given the number of lawsuits that Plaintiff's counsel has brought against various insurers on this same theory, one would think that he could identify this "appropriate population" by now, but apparently he has never been challenged on this issue.

Dr. McCall's opinion makes that challenge.  By noting that Plaintiff's counsel has never identified in this or any other lawsuit what a "proper" percentage of IMEs favorable to insurers should be,[16] Dr. McCall stated that any conclusion that Dr. Nipper is biased must be judged on a comparison of his conclusions to a "random sample" of other doctors diagnosing similar injuries after a similar amount of time. (*Id*. at 2).

In order to complete such a task, based upon the allegations of the Complaint in this case, the "random sample" cannot come from Liberty Mutual.  (McCall Decl. at ¶ 3).  Indeed, Plaintiff alleges that Liberty Mutual has a "pattern and practice" of hiring biased doctors to perform IMEs. (Complaint at ¶ 47).  Although Liberty Mutual certainly disputes any such assertion, the point is this:  drawing a larger "sample" from the very same pool that Plaintiff alleges is tainted to begin with will not assist in proving or disproving the conclusions Dr. McCall has reached, or provide the "random sample" required for comparison. (McCall Decl. at ¶¶ 3-4). In order to rebut Dr. McCall's opinions, which is the justification Plaintiff provides for these additional IMEs, Plaintiff

---

[16] The Court will also note that Liberty Mutual does not request an IME on every claim, and actually does so in a substantial minority of cases.  Such a request is only made when an adjuster or third-party provider questions the propriety of ongoing treatment or the patient's recovery, or the relation of the current condition to the work-related injury.  In other words, someone with sufficient training on the adjustment side would first have to question compensability before an IME is even requested.   This preliminary "filter" would naturally lead to diagnoses that would more commonly confirm the adjuster's impressions.

needs to draw from a sample group of IMEs *outside* of those performed by Liberty Mutual. (*Id.* at ¶ 3).

Put simply, the IMEs demanded by Plaintiff here will not assist Plaintiff in rebutting Dr. McCall's report in any way, and therefore are irrelevant for the purposes Plaintiff presents here in support of her motion to compel.

### 2.   Plaintiff Has Identified No Other Reasonable Basis For Its Production

Plaintiff's alternative argument for the production attempts to piggyback on the untimely "supplemental" affirmative opinion of her own expert, Dr. Lawlor.  (Dkt#37 at 19).  But Dr. Lawlor's opinion speaks in terms of his own personal experiences.  (Dkt#38-13 at 4).  The production of every single IME performed by Liberty Mutual will not change his personal experience, nor will it change any conclusions he has reached.  (*Id.*).  In any event, one would assume that Dr. Lawlor's affirmative opinion is already based upon some acceptable methodology, so there should be no need for the "support" Plaintiff claims these documents would provide. (Dkt#37 at 19-20).

Moreover, Plaintiff's assertion that the information "is relevant to the issue of Liberty's knowledge that it was hiring doctors to provide biased IMEs" seems more a fishing expedition than a legitimate justification.  (*Id.* at 20).  Again, Liberty Mutual has already produced its claim file, claims handling guidelines, incentive programs, the salaries of relevant personnel, and even the agreements with companies that Plaintiff hoped might expose the "pattern and practice" that she alleges.  Plaintiff's motion puts forth no evidence from this production at all, other than a single IME report without any context whatsoever as to whether the injury was misdiagnosed or even

questioned.[17]  And when specifically asked in discovery what evidence she has of corporate "pattern and practice," Plaintiff gave a vague response alluding to other discovery responses specifically relating to Dr. Nipper where Plaintiff claims the response could be ascertained through Westlaw and Nexis, or through the "knowledge" of her attorneys.  (Ex. 21 at 5 (Interrogatory 13), 3-4 (Interrogatories 7, 8)).

Indeed, if an institutional "pattern and practice" existed, Plaintiff would certainly have some evidence of it at this point, given what has been produced and given her attorney's purported pre-existing "knowledge."  The fact that she has provided nothing suggests that there is nothing to provide, and Plaintiff's hope that these IMEs *might* provide something different than what has already been produced is not a sufficient basis to compel an impossible production, as more fully described below. *Lureen,* 2017 WL 3834739, at *5 ("[n]ationwide discovery is not available….. absent a class action or some specialized showing of a pattern or practice" at a higher level).

### 3.   Liberty has no means to reasonably respond to these requests.

Plaintiff's contention that Liberty Mutual has "failed to demonstrate that producing IMEs from 2012 to the present is unduly burdensome" actively ignores the discussions the parties have had for the last seven months and the discovery conducted on this issue.  (*See* Dkt#38-5 at 4;

---

[17] Plaintiff cites to the inadvertently disclosed opinion of Dr. Thomas as evidence of other "biased" diagnoses, claiming it is "almost identical" to Dr. Nipper's reports (without providing any of Dr. Nipper's reports for comparison).  (Dkt#37 at 19).  But Plaintiff cannot seriously contend that another doctor's diagnosis that a minor strain occurred is evidence of anything.  There is nothing medically incorrect about the diagnosis—a strain as described in the report of Dr. Thomas would, in fact, resolve in the time noted in the report.  (*E.g.,* Exs. 19-20).  Plaintiff has not established— and cannot establish—that Dr. Thomas somehow misdiagnosed this patient, who was apparently involved in a minor motor vehicle accident.  (Dkt#38-14 at LM003783-3784).  Furthermore, Dr. Thomas actually opined that the majority of the treatment this patient received as of that date *was* reasonable and necessary, which seems to contradict any suggestion that this doctor was hired for the purpose of denying claims.  (*Id.* at LM003784-3785).

Dkt#38-7 at 3-4; Ex. 7 at 4-5; Dkt# at 4, Ex. 18 at 50-51).  Not only is the request unduly burdensome, it is virtually impossible to respond to it logistically or legally.  (Townsend Decl. at ¶¶ 11-19).  Indeed, in addition to confidentiality or non-disclosure agreements that may exist between Liberty Mutual and various claimants that may be included in such a vast IME "sweep," a mere response to these requests as drafted would likely be in violation of a number of various states' data privacy laws. (For example, such disclosure may violate not only California's regulations regarding the disclosure of medical records, *see, e.g.,* 10 CA ADC §2689.11, but it likely also runs afoul of the California Consumer Privacy Act of 2018 (Cal. Civ. Code §1798.100 e*t seq.*)).

And data privacy concerns notwithstanding, Liberty Mutual has no "database" of IMEs, and no internal mechanism by which Liberty Mutual can identify for which files IMEs have been performed.  (Townsend Decl. at ¶¶ 12, 15).   A doctor is retained through an IME scheduling vendor by an individual adjuster (or, in cases such as the one here, by a third-party provider), and when a report is generated by that doctor it is uploaded into an individual file in Liberty Mutual's "system of record."  (*Id*. at ¶ 12).  The "system of record" is *not* designed in a manner that allows for searches across multiple claims—and in fact, many of the documents uploaded into any individual claim files are not coded for text recognition.  (*Id*. at ¶¶ 3-6).  Thus, in order to retrieve a report, a Liberty Mutual employee would first need to identify the claim and then manually locate the report from the file, extract it, redact it, then produce it.  (*Id.* at ¶¶ 15).

But as arduous as *that* process is, the process of actually locating what Liberty Mutual estimates is *hundreds of thousands* of files in which an IME has been performed is equally if not more so.  (*Id.* at ¶ 18).  Liberty Mutual does not track the files in which an IME has been

performed,[18] so in order to even locate the file, Liberty Mutual would need to "reverse engineer" from a payment perspective and (1) identify all vendors that have been approved to schedule IMEs worldwide, (2) attempt to locate their tax ID information, (3) identify all payments made to that vendor and the claims associated with those payments, and (4) retrieve the claim files for which payment to the vendors were issued, (4) manually review the claim file to determine if the work performed was, in fact, an IME, (5) locate the information responsive to the interrogatory, (6) extract the IME report from each claim file, and (7) redact the reports before producing them. (*Id*. at ¶¶ 14-15). And even if that process was completed—a herculean task—Liberty would still have no means to identify doctors who were *not* retained through an approved vendor system (either because of location or area of specialty) and locate their reports. (*Id.* at ¶ 16).

As Plaintiff is aware, the effort to locate and identify the IMEs related to Dr. Nipper alone took about 20 hours to complete.[19] (*Id.* at ¶ 17). If the identification and production of the approximately 100 reports from a single doctor took that amount of time, the effort to identify and locate a comparable number of reports from the *hundreds* of doctors performing IMEs on behalf of Liberty Mutual throughout the country would easily place the number of hours Liberty Mutual would need to devote to the process of locating and identifying hundreds of thousands of files well

---

[18] Plaintiff repeatedly calls this a "problem of Liberty Mutual's own making," but in the history of this organization it has never been required to respond to a discovery request or inquiry such as this, so it would have no need to track such information in the manner Plaintiff suggests. (*See* Townsend Decl. at ¶ 11)

[19] Plaintiff states in her brief that the process to perform this work took ten hours, which is the original estimate Liberty Mutual gave Plaintiff. (See Dkt#37 at 21). But Liberty Mutual returned to the files to further investigate missing IME reports and, pursuant to Plaintiff's discovery demands, to further respond to interrogatories about the status of the litigation. The total time taken to respond to the requests for Dr. Nipper's IMEs was 20 hours. (Townsend Decl. at ¶ 17).

near (if not exceeding) 60,000 hours.[20]  (Townsend Decl. at ¶ 19).  Indeed, and as Plaintiff notes in her brief, this process could take even longer, as ExamWorks was willing to provide the claim numbers for Dr. Nipper's various examinations but will not conduct a broader query for Liberty Mutual.  (Dkt#37 at 23).  Liberty Mutual would expect a similar response to any such request from other vendors, so it would be forced to try to locate these documents exclusively through tax records.

Thus, regardless of the size of the organization, devoting these types of resources to the whims of a Plaintiff that is now seeking (in the wrong places) support for a theory Plaintiff should have been able to support at the outset of this lawsuit is simply not tenable and it is not "all part of the discovery process," as Plaintiff suggests.  (Dkt#37 at 21). *See also Stephens*, 425 S.E.2d at 584-585 (denying motion to compel when overwhelming burden was established).  Liberty Mutual should not have to incur the significant time and overwhelming expense to produce hundreds of thousands of medical reports that in most cases were never challenged, were never subject to any sort of litigation, and will do nothing to prove or disprove Dr. McCall's opinions.

### 4.  The information sought is not proportional to the needs of the case.

Similarly, even disregarding the overwhelming cost and burden of such a production, the request for IMEs is simply not proportional to the needs of the case.  What Plaintiff proposes here would require Liberty Mutual to expend far more simply to respond than the actual amount in controversy.[21]  *See Morris, Inc.*, 2016 WL 4098570, at *5 (D.S.D. July 28, 2016) (the less relevant

---

[20] Plaintiff is certainly aware of this fact, as Liberty Mutual's 30(b)(6) witness described the lengthy process of locating Dr. Nipper's reports in its entirety.  (Ex. 18 at 30-31).  When the witness began to describe the "massive undertaking of scale and scope" to obtain *all* reports nationwide, Plaintiff's counsel diverted to a question on a different topic.  (*Id.* at 50-51).

[21] As noted above, Plaintiff's purported offer to retain a forensic expert to assist is essentially a paper tiger.  Plaintiff was fully aware that Liberty Mutual would not be willing to provide

discovery is to the heart of the case, the more the expense or work needed to produce the discovery weighs in the balance).  Moreover, as discussed above, the demanded production will do nothing to prove or disprove Dr. McCall's conclusion that a 90 percent rate "favorable" to insurers "doesn't in of itself imply bias or more generally unusual behavior." (McCall Decl. at ¶¶ 3-4).

Considering these factors—the cost and burden, the relevance of the demanded information, and the amount in controversy—the parties and the Court must consider their "collective responsibility" to recognize proportionality.  *Vallejo v. Amgen, Inc.*, 903 F.3d 733, 742–43 (8th Cir. 2018) (citing Fed. R. Civ. P. 26(b)(1), advisory committee's notes to 2015 amendment.  In so doing, "a court can—and must—limit proposed discovery that it determines is not proportional to the needs of the case." *Id.*  Because Plaintiff has made no substantive effort to limit this request in any meaningful way, and, further, because its production will not and *cannot* provide the information Plaintiff asserts in her attempt to justify its compulsion, Plaintiff's motion to compel this information "must" be denied. *Id.*

## CONCLUSION

Make no mistake, the discovery sought by Plaintiff here far exceeds the scope sought by any plaintiff in bad-faith matters.  The expenses Liberty Mutual would need to incur to respond to these requests far exceed the actual amount in dispute. Considering that Plaintiff seeks (1) data and financial information from entities that are not involved in this dispute without establishing (or even *asserting*) any injustice or inequity that would result without this type of veil-piercing discovery, (2) bad-faith information that has *nothing to do* with the allegations of this Complaint,

---

unredacted, private claims files of thousands of claimants uninvolved in the instant action to a third party. Further, the forensic expert would need to conduct the very same searches that Liberty Mutual would be required to search, and Plaintiff cannot reasonably suggest it would incur that expense either.

and (3) IMEs that will not even provide the data that Plaintiff claims is needed to rebut Liberty Mutual's expert opinion, proportionality *must* be considered. *Vallejo,* 903 F.3d at 742–43. Because this demanded information is not relevant "to the heart of the case," and because "the expense or work needed to produce the discovery" is overwhelming, Liberty Mutual respectfully requests that:

1. Liberty Mutual's response to Interrogatory 3 and Request for Production 1 be deemed sufficient, or alternatively that the Court limit the scope of the Request to entities involved in the facts giving rise to this lawsuit;

2. The Court deny Plaintiff's efforts to compel a response to Interrogatory 4 due to Plaintiff's failure to meaningfully compromise, *Lureen,* 2017 WL 3834739, at *5, or, alternatively, to limit the scope of Interrogatory 4 geographically and in a manner consistent with the allegations of the Complaint; and

3. That Plaintiff's motion to compel information about all IMEs performed on behalf of Liberty Mutual for the last ten years be denied, and a protective order preventing this information be granted.

Dated: September 13, 2021

RICHARDSON, WYLY, WISE, SAUCK
& HIEB, LLP

By /s/ Jack H. Hieb
    Attorneys for Defendant

Jack H. Hieb
Post Office Box 1030
Aberdeen, SD 57402-1030
Telephone No.(605)225-6310
E-mail: JHieb@rwwsh.com

and

Daniel W. Berglund
Meghan M. Rodda
GROTEFELD, HOFFMANN, GORDON,
OCHOA & EVINGER, LLP
150 South Fifth St., Suite 3650
Minneapolis, MN 55402
Telephone: (612) 564-4885
dberglund@ghlaw-llp.com
mrodda@ghlaw-llp.com

Attorneys for Defendant

## CERTIFICATE OF COMPLIANCE

In accordance with D.S.D. Civ. LR 7.1(B)(1), I certify that this brief complies with the requirements set forth in the Local Rules.  This brief was prepared in Microsoft Word, using 12-point Times New Roman, and contains 9,263 words.  I have relied on the word count of the word-processing program to prepare this certificate.

Dated this 13th day of September, 2021.

RICHARDSON, WYLY, WISE, SAUCK
   & HIEB, LLP

By  /s/ Jack H. Hieb
   Attorneys for Defendant

Jack H. Hieb
Post Office Box 1030
Aberdeen, SD 57402-1030
Telephone No.(605)225-6310
E-mail: JHieb@rwwsh.com