UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| TONYA HAUKAAS,<br><br>              Plaintiff,<br><br>    vs.<br><br>LIBERTY MUTUAL INSURANCE<br>COMPANY,<br><br>              Defendant. | 4:20-CV-04061-KES<br><br>MEMORANDUM OPINION AND<br>ORDER GRANTING IN PART AND<br>DENYING IN PART PLAINTIFF'S<br>SECOND MOTION TO COMPEL,<br>GRANTING IN PART AND DENYING<br>IN PART DEFENDANT'S MOTION FOR<br>A PROTECTIVE ORDER & DENYING<br>PLAINTIFF'S MOTION TO STRIKE<br><br>[Docket Nos. 36, 39 & 50] |

**INTRODUCTION**

This matter is pending before the court on plaintiff Tonya Haukaas'

second motion to compel responses to interrogatories and the production of

documents.  Docket No. 36.  Defendant resists the motion, and plaintiff has

filed a reply.  Docket Nos. 39 & 46.  In its response to the motion, defendant

made a cross-motion for a protective order and filed a surreply thereafter.

Docket Nos. 39 and 48.  Plaintiff has moved to strike defendant's surreply.

Docket No. 50.  This matter has been referred to this magistrate judge for

determination pursuant to 28 U.S.C. § 636(b)(1)(A) and the October 16, 2014,

standing order of the Honorable Karen E. Schreier, United States District

Judge.

## FACTS

The parties' dispute concerns a worker's compensation policy issued by Liberty Mutual Insurance Company to Aspen Grove Assisted Living while Ms. Haukaas was employed there as a Certified Nursing Assistant. On January 31, 2015, Ms. Haukaas suffered a lower back injury when she and another employee were assisting a nursing home resident who had fallen.  The resident began to fall backwards, and Ms. Haukaas twisted to prevent the resident from falling.  Ms. Haukaas' back made a popping sound, and she felt pain in her lower back.  Due to this injury, Ms. Haukaas sought medical treatment and workers' compensation benefits from Liberty Mutual.

At first, Liberty Mutual accepted Ms. Haukaas' claim as compensable and paid her benefits.  Liberty Mutual contracted with Ohara, a managed-care provider, to oversee Ms. Haukaas' claim.  Docket No. 18-9.  Liberty Mutual asserts it was Ohara, not Liberty Mutual, that was responsible for reviewing Ms. Haukaas' condition and treatment.  Liberty Mutual asserts Ohara contacted ExamWorks, an independent medical examination ("IME") provider, and learned that Dr. Jeffrey Nipper was available to perform an IME.  Ohara contacted and engaged Dr. Nipper for the IME.  Docket No. 18-12.  After reviewing Ms. Haukaas' medical records and conducting an IME, Dr. Nipper offered the opinion that Ms. Haukaas' work-related injuries were not a major contributing cause of her current condition; instead, Dr. Nipper attributed Ms. Haukaas' condition to a chronic degenerative process.  Docket No. 18-13.

Based upon Dr. Nipper's IME, Liberty Mutual denied benefits for past and future medical expenses.  Docket No. 18-15.  These benefits were eventually reinstated after an administrative law judge determined the injury was work-related and found the opinions of Ms. Haukaas' treating physician, Dr. Brett Lawlor, to be more compelling than those of Dr. Nipper.  Docket No. 18-16.  Upon receipt of the determination, Liberty Mutual paid Ms. Haukaas the award and continued paying for her medical treatments. Thereafter, the parties reached a global settlement that resolved outstanding claims except extracontractual claims available under South Dakota law.

The sole count in this cause of action alleges bad faith against Liberty Mutual.  Docket No. 1 at pp. 6-7.  Ms. Haukaas claims Liberty Mutual hired Dr. Nipper as part of a pattern and practice of engaging biased doctors in a scheme to deny claims.  Ms. Haukaas has alleged Dr. Nipper is known to provide biased IMEs in favor of insurance companies and performs at least five IMEs per week—and at least 250 per year—for insurers and their attorneys. Ms. Haukaas has further alleged Dr. Nipper overwhelmingly renders IME opinions in favor of insurers.  Docket No. 1 at p. 7.

Liberty Mutual has hired two experts, Dr. Nipper and David P. McCall, Ph.D., to rebut Ms. Haukaas' claim of bias.  Dr. McCall is a professor of economics, education, and public policy at the University of Michigan, Ann Arbor.  Dr. McCall has opined that, to determine whether Dr. Nipper is biased, Ms. Haukaas first much ascertain "the fraction of times certified medical

3

doctors conducting IMEs in similar circumstances would make the same diagnosis."  Docket No. 38-12 at p. 2.

As a result of Liberty Mutual's expert disclosure, Ms. Haukaas served her second set of interrogatories and requests for production of documents on January 4, 2021.  Docket No. 38-1.  Liberty Mutual responded late to the discovery requests on February 22, 2021.  Docket No. 38-2.  Ms. Haukaas brought to Liberty Mutual's attention alleged deficiencies in its discovery responses in a letter dated March 24, 2021, Docket No. 38-4, and the parties discussed the discovery dispute in a series of letters.  Docket Nos. 38-5 through 38-11 & 42-7.

Ms. Haukaas has consulted Dr. Lawlor to opine about Dr. Nipper's bias.  In a letter dated March 30, 2021, Dr. Lawlor opined that, at least based on those patients he has treated who have also had an IME by Dr. Nipper, Dr. Nipper commonly diagnoses IME patients with a sprain or a strain even when there is clear medical evidence of a more serious condition.  Docket No. 38-13 at p. 4.

On June 17, 2021, Liberty Mutual served an amended response to interrogatory number three from the second set of interrogatories.  Docket No. 38-3.  On July 13, 2021, counsel for Ms. Haukaas sent Liberty Mutual's attorneys a letter describing continued concerns about the insurer's discovery responses.  Docket No. 38-10.  Liberty Mutual responded to Ms. Haukaas' assertions of deficiency on August 6, 2021.  Docket No. 38-11.

Ms. Haukaas filed this second motion to compel on August 23, 2021. Docket No. 36.  The motion seeks an order compelling Liberty Mutual to fully respond to interrogatories three, four, five, and six and requests for production one and eight from the second set of discovery requests.  The court considers each of these discovery disputes in turn.

## DISCUSSION

### A.    Standards Governing Discovery

Federal Rule of Civil Procedure 26(b)(1) sets forth the scope of discovery in civil cases pending in federal court:

> *Scope in General.*  Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within the scope of discovery need not be admissible in evidence to be discoverable.

See Fed. R. Civ. P. 26(b)(1).

If a party fails to respond to a proper request for discovery, or if an evasive or incomplete response is made, the party requesting the discovery is entitled to move for a motion compelling disclosure after having made a good-faith effort to resolve the dispute by conferring first with the other party.  See Fed. R. Civ. P. 37(a).

The scope of discovery under Rule 26(b) is extremely broad.  See 8 Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2007 (3d ed. Oct. 2020 update).  The reason for the broad scope of discovery is that

5

"[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation.  To that end, either party may compel the other to disgorge whatever facts he has in his possession."  Id. (quoting Hickman v. Taylor, 329 U.S. 495, 507-08 (1947)).  The Federal Rules distinguish between discoverability and admissibility of evidence.  FED. R. CIV. P. 26(b)(1), 32, and 33(a)(2) & (c).  Therefore, the rules of evidence assume the task of keeping out incompetent, unreliable, or prejudicial evidence at trial.  But these considerations are not inherent barriers to discovery.

Discoverable information itself need not be admissible at trial; rather, the defining question is whether it is within the scope of discovery.  See FED. R. CIV. P. 26(b)(1).  Additionally, the court may limit the frequency and extent of discovery.  See Fed. R. Civ. P. 26(b)(2); see also Roberts v. Shawnee Mission Ford, Inc., 352 F.3d 358, 361 (8th Cir. 2003) ("The rule vests the district court with discretion to limit discovery if it determines, inter alia, the burden or expense of the proposed discovery outweighs its likely benefit."); Cont'l Ill. Nat'l Bank & Trust Co. of Chi. v. Caton, 136 F.R.D. 682, 684-85 (D. Kan. 1991) ("All discovery requests are a burden on the party who must respond thereto.  Unless the task of producing or answering is unusual, undue or extraordinary, the general rule requires the entity answering or producing the documents to bear that burden.").

Ms. Haukaas was under a duty to meet and confer with Liberty Mutual before filing this motion to attempt to resolve the parties' discovery disputes.  D.S.D. Civ. L.R. 37.1.  Ms. Haukaas asserts she satisfied that duty, see Docket

6

No. 36 at p. 1, and the record demonstrates she has.  Accordingly, the motion is ripe for decision.

**B.    Individual Discovery Requests**

**1.    Interrogatory Number Three and Request for Production One**

In interrogatory number 3, Ms. Haukaas asks Liberty Mutual to:

Describe your relationship to any parent company or subsidiary and[,] for each parent or subsidiary, state the following:

> a.  Your interest and percentage ownership for the previous five years in any business, partnership or corporation, the name, address and telephone number of any persons associated with you in the ownership of such business and state the principal assets and liabilities of such business and the current value of your business interest.

> b.  Whether you are a wholly owned subsidiary of any other company.

> c.  If you are a wholly owned subsidiary of any other company state how profits and losses are distributed between you and your parent company.

> d.  Any salaries, expenses, or losses paid by your parent company in the past five years.

> e.  For the previous five years, identify how much revenue, referrals, and services that your parent companies provide to any and all subsidiaries.

> f.  Identify the value of any and all tangible and intangible property that your parent company has gifted, rented and/or sold to any and all subsidiaries in the previous five years.

> g.  Whether your parent company exercise[s] any power to influence or direct[s] people's behavior or the course of events for you.  If so, please describe the extent of such power and provide examples of such.

> h.  [duplicative of subpart (g)]

      i.   Whether our parent company received any income, revenue, or profits from you.  If so, please state the amount of such profits, revenue, or income received for the previous five years.

      j.   Identify all employees that hold dual employment and/or dual leadership positions with you and your parent company.

Docket No. 38-1 at pp. 3-4.  Ms. Haukaas indicated she is satisfied with Liberty Mutual's responses to subparts (a) and (b).  Docket No. 37 at p. 9.

Request for production number 1 seeks "any and all documents identified in your answers to the above interrogatories or reviewed or relied upon in answering the above interrogatories."  Docket No. 38-1 at p. 5. Ms. Haukaas ties these two discovery requests together, arguing Liberty Mutual's response to request for production number 1 is inadequate because it failed to produce documents reviewed or relied upon in completely answering interrogatory number 3.

Ms. Haukaas argues these categories of information are relevant because information regarding the extent to which Liberty Mutual is intertwined with its affiliated entities is relevant to her intent to amend the complaint to add other entities as defendants.  Liberty Mutual's refusal to provide information beyond annual statements of Liberty Mutual and First Liberty Insurance Company, Ms. Haukaas argues, amounts to an improper withholding.  Docket No. 37 at pp. 10-11.  Ms. Haukaas insists this information is necessary because Liberty Mutual has stated that First Liberty (the underwriter of the relevant policy and the entity that actually provided the insurance benefits in this matter), not Liberty Mutual, is the proper defendant in this lawsuit.  Ms. Haukaas states more information about corporate structure is necessary for her to ascertain

whether "Liberty is so intertwined with its affiliated companies that those parties are properly added to this cause of action."  Docket No. 37 at p. 11.

Liberty Mutual argues in response that this information is irrelevant to the issues in the case because the complaint does not plead veil piercing, and Ms. Haukaas has not supported her theory of veil piercing with any evidence. Liberty Mutual points to its disclosure of First Liberty Insurance Corporation's annual financial statements for the years 2010 to 2020 and Liberty Mutual Insurance Company's annual statements for the years 2016 to 2020, as well as its supplemental response to interrogatory number 3 and request for production number 1, as evidence it has satisfied its duty to respond to these requests for affiliate information.

In her reply brief, Ms. Haukaas represents that Liberty Mutual "is willing to limit this Interrogatory to the companies that are superior on the organizational chart [Docket No. 38-3 at pp. 10-14] to Liberty."  Docket No. 46 at p. 11.  Ms. Haukaas, therefore, limits her discovery request to information about Liberty Mutual Group, Inc., LMCH Massachusetts Holdings, Inc., and Liberty Mutual Holding Company, Inc.  Ms. Haukaas has not identified and the court cannot discern where or when Liberty Mutual made this concession. Liberty Mutual, for its part, did not make this concession in its response brief, instead requesting that its "response to Interrogatory 3 and Request for Production 1 be deemed sufficient, or alternatively that the Court limit the scope of the Request to entities involved in the facts giving rise to this lawsuit."

Docket No. 39 at p. 28.  Accordingly, the court discounts Ms. Haukaas'
representation about Liberty Mutual's concession.

Assessing the parties' positions on their merits, it is clear Liberty Mutual
has sufficiently responded to Ms. Haukaas' discovery requests by providing
annual statements from First Liberty and Liberty Mutual and its answers as
stated in its amended answer to interrogatory 1 and request for production 3
(Docket No. 38-3).  Ms. Haukaas has not shown how information related to
affiliate entities, whether parents, sisters, or subsidiaries, is relevant to the bad
faith claim alleged in the complaint.  Without some showing of relevance to the
claims or defenses raised *in this case*, the court will not compel Liberty Mutual
to divulge veil-piercing discovery where Ms. Haukaas has alleged no veil-
piercing theory.  See Alexander v. 1328 Uptown, Inc., Case No. 18-cv-1544
(ECT/ECW), 2019 WL 4929931, at *7 (D. Minn. Oct. 7, 2019) (granting
protective order precluding plaintiff from engaging in discovery aimed at
piercing the corporate veil of corporate defendants where the complaint alleged
no veil-piercing theory).

Moreover, the sole justification Ms. Haukaas gives for seeking
information about corporate affiliates—that she intends to amend the
complaint to add several affiliated entities as defendants—is not adequately
supported by the record.  State law is used to determine whether and how to
pierce the corporate veil.  Epps v. Stewart Info. Servs. Corp., 327 F.3d 642, 649
(8th Cir. 2003) (citation omitted).  Generally, corporations are considered
separate legal entities until there is sufficient reason not to.  Mobridge Cmty.

10

Indus., Inc. v. Toure, Ltd., 273 N.W.2d 128, 132 (S.D. 1978).  "Sufficient reason," under South Dakota law, contemplates undercapitalization, failure to observe corporate formalities, absence of corporate records, unfairness, injustice, fraud, or other inequitable conduct as a prerequisite.  Kansas Gas & Elec. Co. v. Ross, 521 N.W.2d 107, 112-13 (S.D. 1994).  "[T]he mere fact that one corporation owns all or a majority of the stock of another, or that two corporations have common officers or directors, will not render a parent automatically answerable for acts of its subsidiary."  Satellite Cable Servs. v. N. Elec. Coop., Inc., 581 N.W.2d 478, 482 (S.D. 1998).

The South Dakota Supreme Court announced the instrumentality exception, which is used to determine when a parent is liable for the actions of its subsidiary, in Glanzer v. St. Joseph Indian Sch., 438 N.W.2d 204, 207 (S.D. 1989).  "A parent corporation is liable for the acts of its subsidiary under the instrumentality exception when (1) the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former; and (2) adherence to the rule of corporate separateness would produce injustices and inequities."  Id. (citing Larson v. W. Underwriters, 87 N.W.2d 883, 887 (S.D. 1985) & Mobridge Cmty. Indus., 273 N.W.2d at 132).

Here, Ms. Haukaas seeks discovery related to the first inquiry of the instrumentality exception—control.  But neither her complaint nor her papers filed in support of her motion to compel allege injustice or inequity if she is unable to pierce the corporate veil.  Without such a showing, Liberty Mutual's parent companies are not liable for any act of Liberty Mutual or First Liberty.

11

Additionally, based upon the financial disclosures concerning Liberty Mutual and First Liberty provided to Ms. Haukaas, both those entities are adequately capitalized.  It is not as if the omission of corporate parents from this action would deprive Ms. Haukaas of the proceeds of any judgment she might win. On this record, it is certainly not enough for a threshold showing of relevance of financial and employment information concerning parent entities whose sole relation to the facts of this case is ownership interest of Liberty Mutual. Accordingly, Ms. Haukaas' motion to compel further answers to interrogatory number 3 and request for production number 1 is denied.

### 2.    **Interrogatory Number Four**

In this interrogatory, Ms. Haukaas asks Liberty Mutual to "[i]dentify all other bad faith claims against you for the preceding ten years and state the result of any litigation related thereto."  Docket No. 38-1 at p. 4.  Liberty Mutual objected to this interrogatory on the basis that it is overbroad because it is not limited to the relevant jurisdiction, type of claim, or any relevant period of time.  Liberty Mutual also objected to the extent this interrogatory seeks information that is irrelevant to the issues in this case, to the extent the request is not proportional to the needs of the case, on the basis that this interrogatory seeks confidential and proprietary information, and to the extent it seeks to harass, cause unfair prejudice, confuse the issues, and waste time. Docket No. 38-2 at p. 7.  Liberty Mutual did not offer any answer to this interrogatory.  Id.  In its response in opposition to this motion to compel, Liberty Mutual maintains its objections that the bad-faith information sought

12

is not relevant, unduly burdensome, and not proportionate to the needs of the case.

"[T]his district has . . . routinely compelled discovery of prior lawsuits for bad faith and extracontractual claims." Rounds v. The Hartford, No. 4:20-CV-04010-KES, 2021 WL 4150838, at *10 (D.S.D. Sept. 13, 2021).  In Schultz v. Sentinel Ins. Co., Ltd., No. 4:15-CV-04160-LLP, 2016 WL 3149686, at *8-9 (D.S.D. June 6, 2016), this court dealt with a similar issue.  In an action alleging bad faith and a claim for punitive damages, the plaintiff-insured requested the case name, venue, case number, and the substance of the allegations raised against the defendant-insurer in any bad faith or unfair claims processing cases in the preceding ten years.  Id. at *8.  The defendant-insurer objected on relevance and unduly broad/overly burdensome grounds. Id.  The defendant-insurer provided some responsive information, but the plaintiff-insured brought a motion to compel seeking more complete information, including the substance of the allegations in each lawsuit.  Id. This court granted the plaintiff-insured's motion, reasoning as follows:

> This issue is not a new one.  Evidence of past bad faith claims and unfair claims processing claims are routinely asked for and routinely produced, or ordered to be produced, in this district.  See e.g. Lillibridge v. Nautilus Ins. Co., 2013 WL 1896825, at *5-6 (D.S.D. May 3, 2013); Kirschenman v. Auto-Owners Ins., 280 F.R.D. 474, 489 (D.S.D. 2012); Beyer v. Medico, 5:08-cv-05058-JLV, Docket No. 61, at pp. 13-114 [sic] (D.S.D. Nov. 13, 2009). And they are not limited to the exact type of claim presented by the plaintiff in the case—i.e. property only, first-party only, weather-related only.  See Lillibridge, 2013 WL 1896825 at *5.
>
> That is because, in order to prove bad faith, the plaintiff must show that the insurance company unreasonably investigated or denied a claim knowing that there was coverage, or acted with

13

> reckless disregard to whether the facts indicated coverage. <u>Id.</u>
> (citing <u>Dakota, Minnesota & Eastern RR Corp. v. Acuity</u>, 771
> N.W.2d 623, 632 (S.D. 2009)). To prove punitive damages, the
> plaintiff must show the insurance company acted with malice,
> actual or presumed. <u>Id.</u> (citing <u>Bertelsen v. Allstate Ins. Co.</u>, 796
> N.W.2d 685, 698-99 (S.D. 2011)). Relevant to the issue of punitive
> damages is whether the insurance company engaged in a pattern
> or practice of conduct that caused harm to those who are
> financially vulnerable. <u>Id.</u> (citing <u>Roth v. Farner-Bocken Co.</u>, 667
> N.W.2d 651, 666 (S.D. 2003)). Evidence of other claims against
> [defendant-insurer] alleging bad faith or unfair claims practices is
> relevant to the *prima facie* claim of bad faith as well as to [plaintiff-
> insured's] punitive damages claim.

<u>Id.</u> at *9. Based on this reasoning, this court ordered the defendant-insurer to provide, for every lawsuit responsive to the plaintiff-insured's discovery request, the complaint and answer (including any amended complaints and amended answers), the docket sheet, and copies of any dispositive motions and responding briefs, as well as a brief summary of the outcomes of the cases. <u>Id.</u>

Liberty Mutual argues <u>Lillibridge</u> is distinguishable because the plaintiff in that case presented more evidence of a pattern or practice of improperly or arbitrarily denying insurance claims before filing a motion to compel the production of prior litigation against the insurer related to bad-faith claims handling. Docket No. 39 at pp. 15-16. Liberty Mutual's argument misses the mark. There is no requirement that a plaintiff must prove—or substantially prove—their case before they are entitled to discovery. Rule 26 does not force plaintiffs to jump through these hoops. Rule 26 only requires that discovery sought be relevant to a party's claim or defense, proportional to the needs of the case, non-privileged, and that its likely benefit outweighs the burden or expense of complying with the request.

14

Assessing Ms. Haukaas' request according to Rule 26's framework, the court disagrees with Liberty Mutual and follows <u>Lillibridge</u>.  In that case, the district court rejected the defendant-insurer's argument that discovery should be limited to first-party bad faith, weather-related, property claims from South Dakota.  <u>Lillibridge</u>, 2013 WL 1896825, at *6.  The district court rejected this argument, reasoning that, "[w]hile evidence of first-party bad faith, weather-related, property damage claims may be *more* relevant or factually analogous to Lillibridge's claim, it does not lead to the conclusion that other bad faith claims are *not relevant* to this case."  <u>Id.</u>  "Lillibridge is not necessarily limited to admitting evidence of identical prior claims involving the loss of a roof due to a hailstorm in South Dakota to show the nexus between the requested discovery and his claim.  Instead, prior bad faith litigation may be relevant to show [defendant's] knowledge and conduct and whether a pattern and practice of inadequate investigation, offering unreasonably low settlement offers, or other reprehensible conduct is being repeated among policyholders."  <u>Id.</u>  Therefore, prior bad faith claims against Liberty Mutual need not be related to workers compensation to be discoverable in this action.

However, "[f]or discovery of out-of-state claims or documents to be relevant in this case 'these cases must share some factual or legal vector with [Ms. Haukaas'] claims.' "  <u>Id.</u> at *5 (quoting <u>Kischenman</u>, 280 F.R.D. at 489).  <u>See also</u> <u>State Farm Mut. Auto. Ins. Co. v. Campbell</u>, 538 U.S. 408, 422 (2003) ("Lawful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is

15

tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff.").

Brown Bear v. Cuna Mut. Grp., 266 F.R.D. 310 (D.S.D. 2009), is instructive.  There, the plaintiff made a discovery request similar to the one raised by Ms. Haukaas here—"any documents relating to litigation involving claims against Cuna for breach of contract or bad faith." Id. at 325.  The court narrowed this request, finding that claims denied on the same basis as the plaintiff's claim share the nexus described by the Supreme Court in Campbell. Id.

> Because Cuna initially denied Brown Bear's insurance claim based upon the time filing rule, the court finds that such documents have a nexus to the harm suffered by plaintiff. . . .  [H]owever, the court agrees that Brown Bear's request for all documents relating to claims of breach of contract or bad faith should be narrowed to encompass those claims bearing a nexus to the specific harm alleged by Brown Bear.").  The court concluded that, "[w]hen the scope is appropriately narrowed to include litigation involving the time filing provision specifically, rather than breach of contract or bad faith generally, this court believes the requested documents are discoverable.

Id.

So too here.  Ms. Haukaas' request for nationwide discovery of bad-faith claims should be narrowed to those claims that share a specific nexus with the harm she alleges.  Because Liberty Mutual denied Ms. Haukaas' claim based on an IME report, the court finds that prior bad-faith litigation involving a denial of benefits following an IME is relevant.  With the scope of this request narrowed to litigation files involving denial after an IME—instead of bad-faith generally—the requested documents are relevant.  Because the documents Ms. Haukaas requests may reveal that Liberty Mutual's alleged conduct in this

16

case occurs more frequently and, as a result, risks harm to many, the requested documents may be relevant to demonstrate reprehensibility, which is a proper consideration in a punitive damages determination.  See Philip Morris USA v. Williams, 549 U.S 346, 357 (2007) (finding "conduct that risks harm to many is likely more reprehensible than conduct that risks harm to only a few. And a jury consequently may take this fact into account in determining reprehensibility").

Ms. Haukaas also asks for regulatory complaints brought against Liberty Mutual alleging bad faith denial of benefits.  Docket No. 46 at p. 11.

> [I]nformation about regulatory actions and consumer complaints is not a new issue in bad faith litigation in this district.  Lillibridge, 2013 WL 1896825 at *13; Lyon [v. Bankers Life & Cas. Co., No. CIV. 09-5070-JLV, 2011 WL 124629, at *15 (D.S.D. Jan. 14, 2011)]; McElgunn, Civ. No. 06-05061 Docket No. 206 at p. 14 (D.S.D. 2008); Beyer, 266 F.R.D. at 339. This information is relevant for the same reason the information about past bad faith claims against Sentinel is relevant: it may tend to show a pattern or practice of business conduct by Sentinel that shows it denied claims it knew were covered, or that it acted with reckless disregard in denying such claims.  Lillibridge, 2013 WL 1896825 at *13; Beyer, 266 F.R.D. at 339.

Schultz, 2016 WL 3149686, at *13.  The court concludes such information is relevant to Ms. Haukaas' assertion of bad faith because it may show a pattern or practice of business conduct by Liberty Mutual that shows it denied claims it knew were covered, or that it acted with reckless disregard in denying those claims.

Thus, Ms. Haukaas has made a threshold showing of relevance for bad-faith litigation and regulatory complaints against Liberty Mutual involving denial after an IME for the past 10 years.  The burden now shifts to Liberty

Mutual to show that this interrogatory is unduly burdensome or not proportionate to the needs of the case.

### a.   Undue Burden

"All discovery requests are a burden on the party who must respond thereto.  Unless the task of producing or answering is unusual, undue or extraordinary, the general rule requires the entity answering or producing the documents to bear that burden."  Lillibridge, 2013 WL 1896825, at *6 (quoting Cont'l Ill. Nat' Bank & Trust Co. of Chi. v. Caton, 136 F.R.D. 682, 684-85 (D. Kan. 1991)).  Liberty Mutual asserts it would be unduly burdened by an order compelling its response to this interrogatory because it, unlike the defendant-insurers in Lillibridge and Lyon, is one of the country's largest insurers, providing virtually every type of insurance available.  The sheer volume of responsive cases, according to Liberty Mutual, is itself overly burdensome.  Docket No. 39 at p. 17 n.12.  This is because Liberty Mutual does not internally track which lawsuits brought against it include bad-faith claims and cannot easily identify and track specific disputes with bad-faith claims to determine how they resolved.  This, Liberty Mutual asserts, makes the process arduous, costly, and time consuming.

Liberty Mutual specifically states it would need to retrieve and review approximately 26,000 claim files that were submitted to its legal department for litigation oversight.  This number does not include any state regulatory complaints.  Docket No. 40 at p. 3.  Liberty Mutual notes that, if reviewing each of the 26,000 files takes 30 minutes, it would take 13,000 workhours to

manually review these files to identify which of them involved bad-faith claims. This, Liberty Mutual argues, makes the burden of complying with this interrogatory undue and extreme.  But Liberty Mutual's correspondence regarding discovery makes clear the problem is not the number of files it would need to review; the problem is the time it would take to manually review each file.  See Docket No. 38-7 at p. 2 ("[T]he number of such claims is not the issue. The issue is that Liberty would need to reopen every file in which bad faith was alleged over the course of the last ten years—regardless of any tie to workers compensation claims handling—to evaluate the claim and how the matter resolved.").

Thus, Liberty Mutual indicates its agents would need to thumb through each claim file to ascertain whether it involved an allegation of bad faith. Liberty Mutual has presented evidence that its records are not text-searchable such that they could be electronically searched for specific words or key phrases—e.g., "bad faith" or "independent medical examination."  Docket No. 40 at p. 2, ¶ 6.  "The use of specific words or key phrases in electronic searches of computerized claim files has been approved historically in this district." Lyon, 2011 WL 124629, at *11 (citing McElgunn, CIV. 06-5061, Docket No. 84 at pp. 2-3 (D.S.D. 2007) & Brown Bear, 266 F.R.D. at 323.  However, due to the way Liberty Mutual retains its claims files in the system of record, searches using optical character recognition data are impossible.

Liberty Mutual has presented evidence that it would also need to manually review each regulatory complaint to determine whether it involves a

19

bad-faith claim.  Docket No. 40 at p. 3, ¶ 10.  These records can be sorted according to state of origin, line of coverage, and underwriting company, but not the substance of the claim.  Id.  It appears these databases also cannot be searched according to optical character recognition data.

This burden, Ms. Haukaas argues, is of Liberty Mutual's own making and should not limit her ability to discover information about prior bad-faith litigation and regulatory complaints.  Docket No. 38-10 at p. 3.  Ms. Haukaas further asserts a limitation based on type of claim would not alleviate the burden on Liberty Mutual; a search limited to bad-faith claims related to a worker's compensation policy would still require Liberty Mutual to search all files sent to its home legal office.  Docket No. 38-10 at p. 3.  Therefore, limitations based on type of claim (or, following the court's finding on the issue of relevance, whether a denial followed an IME) would not decrease Liberty Mutual's burden in responding to this interrogatory.  Therefore, it appears the only effective limitations would be geographical and temporal.  See Docket No. 38-11 at p. 3 ("Liberty Mutual does have the capability to determine the jurisdiction and date of a file without manually reviewing it, so any limitation on the scope of the discovery request or its timeframe would indeed limit the burden you are imposing on Liberty Mutual.").

Several courts have determined that, when discovery requests are relevant, the fact that answering them will be burdensome and expensive is not itself a reason to deny a motion to compel.  See In re Folding Carton Antitrust Litig., 83 F.R.D. 260, 265 (N.D. Ill. 1979) (stating "[b]ecause the interrogatories

themselves are relevant, the fact that answers to them will be burdensome and expense is not in itself a reason for refusing to order discovery which is otherwise appropriate" (quotation omitted)); <u>Alexander v. Parsons</u>, 75 F.R.D. 536, 539 (W.D. Mich. 1977) (stating that "the mere fact discovery is burdensome . . . is not a sufficient objection to such discovery, providing the information sought is relevant or may lead to the discovery of admissible evidence"); and <u>Burns v. Imagine Films Entm't, Inc.</u>, 164 F.R.D. 589, 593 (W.D.N.Y. 1996) (the fact that answering interrogatories will require the objecting party to expend considerable time, effort, and expense consulting, reviewing, and analyzing huge volumes of documents and information is an insufficient basis for an objection). Moreover, if discovery requests are relevant, the fact that they involve work, which may be time consuming, is not sufficient to render them objectionable. <u>See</u> <u>United States v. Nysco Labs., Inc.</u>, 26 F.R.D. 159, 161-62 (E.D.N.Y. 1960) (citation omitted) & <u>Rogers v. Tri-State Materials Corp.</u>, 51 F.R.D. 234, 245 (N.D. W. Va. 1970) (citation omitted) (stating "[i]nterrogatories, otherwise relevant, are not objectionable and oppressive simply on grounds [that] they may cause the answering party work, research and expense"). <u>See</u> <u>Brown Bear</u>, 266 F.R.D. at 320-21.

The court is mindful that Liberty Mutual is not a small business unfamiliar with the intricacies and requirements of litigation, and it agrees with the conclusion of other district courts that permitting "a defendant whose business generates massive records to frustrate discovery by creating an inadequate filing system, and then claiming undue burden, would defeat the

purposes of the discovery rules." Kozlowski v. Sears, Roebuck & Co., 73 F.R.D. 73, 76 (D. Mass. 1976); accord Beseke v. Equifax Info. Servs., LLC, No. 17-cv-4971-DWF-KMM, 2018 WL 6040016, at *4 (D. Minn. Oct. 18, 2018); Zubulake v. UBS Warburg LLC, 217 F.R.D. 309, 321-22 n.68 (S.D.N.Y. 2003).  Although Liberty Mutual has shown that information responsive to this request is not in a readily accessible format, the court is reticent to find undue burden where the most burdensome aspect of complying with this interrogatory—manually reviewing each file sent to the home legal office to determine whether that action or regulatory complaint involved a bad-faith claim—would largely be obviated if Liberty Mutual tracked litigation against it or retained its claims files in a format compatible with optical character recognition.

As such, the fact that Liberty Mutual will have to review voluminous claims and regulatory action files to search for litigation and regulatory complaints involving bad faith is not itself a sufficient reason to find that interrogatory four is unduly burdensome.

### b.    Proportionality

Federal Rule of Civil Procedure 26(b)(1) limits discovery to information that is "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  FED. R. CIV. P. 26(b)(1).

Here, Liberty Mutual has shown that manually reviewing litigation files and regulatory complaints would take countless hours and would cost an exorbitant amount.  The court concludes the expense of complying with this interrogatory—even as narrowed by the court—outweighs its likely benefit. Therefore, requiring Liberty Mutual to produce a narrower set of materials is appropriate in this case.

Considering the massive volume of records Liberty Mutual must work through, the expense of identifying and producing information about bad-faith claims raised from 2018 to the present does not outweigh its likely benefit. Liberty Mutual denied benefits to Ms. Haukaas in November 2015, and the South Dakota Department of Labor rejected Dr. Nipper's medical opinion and reinstated benefits in May 2017.  While bad-faith claims raised in 2018, 2019, 2020, and 2021 might be relevant to the issues in this case, the expense of producing them outweighs their likely benefit; bad-faith conduct alleged in those claims would likely be remote for purposes of establishing a pattern and practice.  The same is true for bad-faith claims and regulatory complaints raised in 2010 and 2011.  Therefore, the court limits the scope of this interrogatory to claims and regulatory complaints alleging bad faith from 2012 through 2017.

Liberty Mutual presents as an untenable hypothetical a scenario where a Liberty Mutual affiliate in New Jersey would need to produce information pertaining to a bad-faith claim arising out of the handling of a commercial hail claim in New Jersey, where different laws govern and different company

23

guidelines apply to the claim.  The court doubts this parade of horribles would come to pass.  First, the court has narrowed this interrogatory to claims and regulatory complaints arising from a denial after an IME—that limitation excludes hail damage files.  Second, this interrogatory is directed at Liberty Mutual or anyone acting at its direction, not the breadth of Liberty Mutual-affiliated companies around the country or globe.  See Docket No. 38-1 at pp. 1, 4.  So, it follows that only claims raised against Liberty Mutual, not its various affiliated entities, are responsive to this request.

Liberty Mutual also objects, for the first time in its response to the motion to compel, on the basis that it should not be forced to re-litigate the issue of whether any bad-faith claim, regardless of the type of claim or underwriting company, is relevant to punitive damages.  Docket No. 39 at p. 17 n.11.  This is because, Liberty Mutual argues, it should not be subject to what is effectively a civil version of double jeopardy.  Id. (citing in re "Agent Orange" Prod. Liab. Litig., 100 F.R.D. 718, 728 (E.D.N.Y. 1983) ("There must . . . be some limit, either as a matter of policy or as a matter of due process, to the amount of times defendants may be punished for a single transaction.")), aff'd, 818 F.2d 145 (2d Cir. 1987), cert. denied, 484 U.S. 1004 (1988); In re "Dalkon Shield" Prod. Liab. Litig., 526 F. Supp. 887, 899 (N.D. Cal. 1981) ("A defendant has a due process right to be protected against unlimited multiple punishment for the same act."), vacated on other grounds, 693 F.2d 847, 852 (9th Cir. 1982), cert. denied, 459 U.S. 1171 (1983)).

This argument fails on several grounds.  First, and most foundationally, Liberty Mutual has not shown that it has previously defended any lawsuits arising from the facts alleged by Ms. Haukaas herein.  Without any such prior legal action, there is no likelihood whatsoever that Liberty Mutual will be subject to multifarious liability for the same act.  Second, Liberty Mutual has not identified any other cases where it has already litigated the issue of whether prior bad-faith claims are relevant to present bad-faith claims, regardless of type of claim or underwriting company.  Without any showing of which prior lawsuits arguably preclude the litigation of this issue, the court cannot begin to assess Liberty Mutual's argument.

Lastly, Liberty Mutual suggests this interrogatory is improper because it would require it to disclose information subject to confidentiality agreements between parties to the prior litigation.  This concern can be ameliorated through the entry of a protective order, and confidentiality clauses in settlement agreements typically include an exception if disclosure is ordered by a court.  The court will grant a protective order that ensures the continued confidentiality of the information in its use in this litigation.  In summary, Liberty Mutual is ordered to identify and state the outcome of the litigation of bad faith claims and regulatory complaint lodged against it in the years 2012 through 2017 where the denial of benefits followed an IME.

**3.      Interrogatory Five, Interrogatory Six & Request for Production Eight**

Interrogatory five asks Liberty Mutual to:

Identify each person hired to conduct an IME or Records Review from November 3, 2010 to the present of any insured of The First Liberty Insurance Corporation, Liberty Mutual Insurance Company, Liberty Mutual Group, Inc., LMHC Massachusetts Holdings, Inc., Liberty Mutual Holding Company, Inc., or any parent or subsidiary of those entities. This interrogatory is not limited to persons hired by those entities but also includes persons hired by any affiliate or agent of those listed entities.

Docket No. 38-1 at p. 4.

Interrogatory six asks Liberty Mutual to state, for each person identified in interrogatory five,

a.      How many times the person was hired to conduct and [sic] IME or Records Review.

b.      How many claims were denied based wholly or in part upon the IME or Records Review results.

c.      The steps taken by you to determine any biases each person identified in Interrogatory Number 14[1] had.

Docket No. 38-1 at p. 4.

Request for production eight asks Liberty Mutual to "[p]roduce a copy of each IME report or Medical Records review from November 3, 2010 to the present, as referenced in Interrogatory Numbers 5 and 6.  For purposes of this request, you may redact any personal identifying information of the claimant. This request is not limited in geographical scope."  Docket No. 38-1 at p. 5. Liberty Mutual has already produced IME reports authored by Dr. Nipper.

---

[1] This appears to be a drafting error, and the court interprets this subpart to reference interrogatory five.

Since making these discovery requests, Ms. Haukaas has agreed to limit the timeframe to 2012 to the present.  Docket No. 37 at pp. 37-38.  The court first considers whether Ms. Haukaas has met her initial burden to show the relevance of information related to the individuals Liberty Mutual has hired to perform IMEs and documents related to the IMEs themselves.

Ms. Haukaas asserts information about all IMEs performed at Liberty Mutual's request is relevant because Dr. McCall, Liberty Mutual's expert, has offered the opinion that, among other things, "[t]o determine whether Dr. Nipper's conclusions from conducting an IME exhibit any bias[,] his conclusions need to be compared to the conclusions from a random sample of IME reports conducted by other physicians on individuals with similar types of conditions to those examined by Dr. Nipper where the IME was conducted after a similar amount of time has elapsed between the date of reported occurrence of the injury and the date of the IME."  Docket No. 38-12 at p. 2.  "What needs to be determined first is the fraction of times certified medical doctors conducting IMEs in similar circumstances would make the same diagnosis. Once this is accomplished, the fraction of times the particular doctor under scrutiny makes this diagnosis can be compared to this population fraction to determine whether any statistical evidence exists as to whether this doctor makes this type of diagnosis more (or less) frequently than usual."  Id.

Dr. McCall concluded that Ms. Haukaas "provides no evidence about the fraction of time certified medical doctors that examine patients in similar circumstances to those examined by Dr. Nipper, when conducting an IME[,]

27

would make the same diagnosis.  Therefore, any conclusion of bias is unwarranted and is not based on any type of statistically reliable evidence." Id. at p. 3.

Thus, Ms. Haukaas argues, to address the defense outlined in Dr. McCall's report, she would need to study a sample of all IME reports from similarly situated doctors evaluating similar injuries after a similar amount of time from all other insurance companies in the country to ascertain a baseline statistical probability that an IME report is favorable to an insurance company.  However, obtaining every IME report—or even simply logging the outcome of every IME—is not a viable option for Ms. Haukaas.  But IME reports in Liberty Mutual's possession are a different story; in this litigation, Ms. Haukaas is empowered by Federal Rules of Civil Procedure 26 and 34 to request information and documents from Liberty Mutual.  And, Ms. Haukaas argues, Liberty Mutual should not be entitled to offer Dr. McCall's opinion—which says Ms. Haukaas' claim of bias must fail if she cannot determine a baseline probability of whether an IME report favors the insurer—then shield itself from discovery by arguing that producing information related to all IMEs—from which such a statistical probability could be calculated—is irrelevant or unduly burdensome.

Ms. Haukaas' argument is compelling.  Liberty Mutual put the outcomes of all IMEs—including those performed for Liberty Mutual—at issue by presenting the opinion of Dr. McCall.  As such, information regarding the

28

outcomes of IMEs performed for Liberty Mutual from 2012 to the present is relevant to the issues presented in this case.

Liberty Mutual resists this conclusion, arguing the rate at which physicians it hires to perform IMEs cannot be relevant because Ms. Haukaas has claimed Liberty Mutual engages in a pattern of hiring biased physicians. Therefore, Liberty Mutual argues, any population statistic calculated from IMEs performed for Liberty Mutual would not, one way or the other, tend to show whether Dr. Nipper's statistical likelihood of rendering an IME opinion in favor of Liberty Mutual is so high as to suggest bias. Instead, Liberty Mutual suggests the random sample of other doctors diagnosing similar injuries after a similar amount of time must come from outside Liberty Mutual to be relevant to Ms. Haukaas' bad-faith claim. Docket No. 39 at p. 21.

There is sense in Liberty Mutual's argument. It would be preferable for the population statistic, against which Dr. McCall says Dr. Nipper's statistic should be compared, to be a truly representative sample of the whole insurance industry. But, as Ms. Haukaas notes in her reply brief, these industry-wide data are not readily available.

Regardless, relevance under Rule 26 is not so narrow that Ms. Haukaas' mere allegation that Liberty Mutual has a pattern of hiring biased doctors can operate to preclude her from discovering any data useful for calculating a population statistic. "Relevancy . . . encompass[es] 'any matter that could bear on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.' " E.E.O.C. v. Woodmen of the World Life Ins.

Soc'y, No. 8:03CV165, 2007 WL 1217919, at *1 (D. Neb. Mar. 15, 2007) (quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)). Indeed, such data could also be relevant to show that Liberty Mutual's population statistic is biased in favor of the insurer when compared to an industry-wide population statistic; such a finding would be highly relevant to Ms. Haukaas' allegation of a pattern and practice of bad faith. Therefore, the court overrules Liberty Mutual's relevance objection.

Ms. Haukaas also asserts the reports themselves are—separate from Dr. McCall's opinion—relevant to the issue of Liberty Mutual's knowledge that it was hiring biased doctors to provide IMEs by issuing reports stating the claimant's physical ailments resolved within weeks of their injury and were the result of a sprain or strain instead of a more significant injury. Ms. Haukaas' expert, Dr. Lawlor, has reviewed Dr. Nipper's IME opinions in several other cases and concluded that Dr. Nipper commonly diagnoses sprains and strains even when there is clear medical evidence indicating otherwise. Docket No. 38-13 at p. 4. Ms. Haukaas argues that this, together with an IME opinion from Dr. Mark Thomas, D.O., which also diagnosed the claimant with sprain/strain injuries (Docket No. 38-14), suggests that Liberty Mutual has a pattern and practice of hiring biased doctors, beyond Dr. Nipper, whose reports are relevant to Ms. Haukaas' bad-faith argument and her request for punitive damages.

However, whether any given IME was rendered by a biased physician cannot be determined by examining the IME report itself. That is, in the case

of the IME report of Dr. Thomas, there is no telling whether Dr. Thomas was correct in diagnosing the claimant with sprain/strain injuries or if he minimized the injuries out of bias in favor of the insurer.

Yet, as Ms. Haukaas notes in her reply brief, the IME reports might show that physicians who issued IMEs favorable to the claimant were re-hired significantly fewer times than physicians who issued IMEs favorable to the insurer. Such a disparity would be highly relevant to Ms. Haukaas' claim of bad faith. The actual identities of physicians who are not at issue in this case is, however, irrelevant. Even with a protective order or confidentiality agreement, the possible benefit of disclosing the actual names of every physician who performed an IME for Liberty Mutual from 2012 to the present does not justify such an expansive disclosure of personal information. Therefore, the motion to compel as to interrogatories five and six is denied.

Having concluded the outcomes of IME reports are relevant to Ms. Haukaas' bad-faith claim, the court turns next to Liberty Mutual's assertion that the burden and expense of producing this information is disproportionate to the needs of the case. Again, Federal Rule of Civil Procedure 26(b)(1) limits discovery to information that is "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." FED. R. CIV. P. 26(b)(1).

31

Liberty Mutual has asserted it would be virtually impossible for it to comply with Ms. Haukaas' request for information.  In the context of confidentiality and non-disclosure obligations that bind Liberty Mutual to various claimants whose medical records would be caught up in the broad disclosure of IME reports, Liberty Mutual argues the requests as drafted would likely violate multiple states' data privacy laws.  The court believes the application of redactions to the names of claimants, together with the protective order already in place (docket nos. 19 & 26) and the protective order contemplated in this opinion, should ameliorate these concerns.

Although Liberty Mutual makes much of the fact that it would need to utilize its IME vendors to obtain copies of IME reports, those reports are still within Liberty Mutual's "control" under Federal Rule of Civil Procedure 34. Rule 34 governs requests for the production of documents and provides that a party may ask another party to permit copying of documents "in the responding party's possession, custody, or control."  See FED. R. CIV. P. 34(a)(1). The concept of documents in a party's "possession" or "custody" is clear enough, but the concept of documents in a party's "control" is not obvious upon a reading of the rule.

The rule that has developed is that if a party "has the legal right to obtain the document," then the document is within that party's "control" and, thus, subject to production under Rule 34.  See 8A Charles A. Wright, Arthur R. Miller, & Richard L. Marcus, Fed. Practice & Procedure, §2210, at 397 (2d ed. 1994).  "Because a client has the right, and the ready ability, to obtain copies

of documents gathered or created by its attorneys pursuant to their representation of that client, such documents are clearly within the client's control." American Soc. for the Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus, 233 F.R.D. 209, 212 (D.D.C. 2006) (citing Poole ex rel. Elliott v. Textron, Inc., 192 F.R.D. 494, 501 (D. Md. 2000); and Poppino v. Jones Store Co., 1 F.R.D. 215, 219 (W.D. Mo. 1940)).

Thus, although the IME reports may be in the possession of Liberty Mutual's vendors, they are still discoverable in this litigation because Liberty Mutual has a legal right to obtain them.  The reports are within the control of Liberty Mutual regardless of where they are stored and which entity actually possesses them.  Accordingly, the court considers Liberty Mutual's assertion of difficulty retrieving the reports only in terms of undue burden and proportionality.

As far as logistical impracticability, Liberty Mutual has asserted Ms. Haukaas' request is virtually impossible to respond to.  According to Liberty Mutual, there is no database of IME reports and no internal mechanism Liberty Mutual could use to identify for which claimants IMEs were performed. The storage structure for claims within Liberty Mutual's system of record does not allow for text searches across multiple claims, and many of the individual documents within claims files are not compatible with optical character recognition.  In order to retrieve an IME report to ascertain information about its date, provider, and outcome, Liberty Mutual would first need to identify the claim and then manually locate the report within the file.  Liberty Mutual

33

estimates this process would need to be repeated hundreds of thousands of times to log all IMEs performed on its behalf from 2012 to the present.

But, before it can retrieve IME reports from those hundreds of thousands of files, Liberty Mutual first needs to identify the claims files that contain IME reports. Liberty Mutual indicates it does not track the files in which an IME has been performed, and it has no way of doing a controlled search of its files to identify those claims quickly and accurately. Indeed, Liberty Mutual suggests the most efficient way to identify most of the files where an IME has been performed is working through payments made to its approved vendors and manually reviewing each claim file to determine if the work performed by the vendor was an IME. This process, according to Liberty Mutual, would still not identify IMEs not performed through an approved vendor system due to location or area of specialty.

Liberty Mutual offers 60,000 hours as a rough estimate to accomplish this work. This burden and cost, Liberty Mutual argues, far outweighs any benefit which Ms. Haukaas could reasonably expect to receive from this information. The court is skeptical of this estimate. Although Liberty Mutual itself may not track files in which IMEs are obtained, its agent Ohara almost certainly does track such information. Liberty Mutual never explains why it cannot simply ask Ohara (and any other third-party intermediaries that may exist) to compile a list of Liberty Mutual cases in which Ohara procured IME opinions for Liberty Mutual and, thus, narrow its search in that manner. Ms. Haukaas argues the IME data sought are proportional to the needs of this

34

case when public policy and business-practices concerns are considered.

Ms. Haukaas argues the proportionality considerations in this case should be

weighed on the same terms as in <u>Schultz</u>, 2016 WL 3149686, at *7.  There, the

court noted that

> Rule 26 requires the court to consider, in regard to proportionality, not
> only the amount of damages at stake, but also the importance of the
> interests in the case, the parties' access to relevant information, the
> parties' resources, how important the discovery is to the issues, and
> whether the burden of producing the discovery outweighs its likely
> benefit.  <u>See</u> FED. R. CIV. P. 26(b)(1).  The Advisory Committee notes
> stress that public policy concerns, philosophic, social, or institutional
> matters are to be considered and may dwarf the consideration indicated
> by the "relatively small amounts of money or no money at all" that may
> be at stake in the litigation.  <u>See</u> FED. R. CIV. P. 26(b)(1), 2015 Advisory
> Committee notes.
>
> Ms. Schultz, as discussed above, has asserted a bad faith claim and a
> claim for punitive damages.  <u>See</u> Docket No. 1.  Her theory of her bad
> faith claim is that Sentinel's denial of her claim was part of a larger,
> company-wide culture of knowingly denying valid claims in order to
> profit therefrom.  It remains to be seen whether Ms. Schultz will prevail
> on this claim, but if she does, her claim is about many victims of an
> unscrupulous claims-handling practice.  As a practical matter, most
> insureds who are unfairly treated by Sentinel will not have the fortitude,
> motivation, or luck to be able to bring suit.  If punitive damages are
> awarded, Ms. Schultz has the potential to affect Sentinel's alleged
> business practices and to remedy the situation for many insureds, not
> just herself.  It is this "value" of the case the court considers when
> evaluating the proportionality of the discovery Ms. Schultz seeks, in
> addition to the other factors set forth in Rule 26.

<u>Id.</u>

Ms. Haukaas argues these same public policy considerations should tip

the scales in favor of production in this case.  "If the Plaintiff prevails here," she

argues, "the outcome of this litigation could help change Liberty's biased IME

practices that would benefit Liberty's insureds.  The potential public benefit of

this litigation is significant, and therefore, the discovery sought is not out of

proportion to the needs of this case and is also relevant to punitive damages in this case." Docket No. 46 at p. 9.

While the allegations in Ms. Haukaas' complaint, similar to the allegations in Schultz, assert the denial of her claim was part of a larger, company-wide culture of knowingly denying valid claims and the "value" of this case involves the potential to affect Liberty Mutual's alleged business practices and remedy unfavorable situations for many other insureds, that value still does not outweigh the expense of an estimated 60,000 hours of work.

However, were the request limited in temporal and geographic scopes, the balance of proportionality tips in favor of Ms. Haukaas.  The court concludes the time frame of 2012 through 2017 is appropriate to this request for the same reasons stated regarding interrogatory four.  Additionally, the court will limit the geographical scope of request for production eight to the states that make up the Eighth Circuit Court of Appeals—North Dakota, South Dakota, Nebraska, Minnesota, Iowa, Missouri, and Arkansas.  With the scope of request for production eight limited in this manner, the court grants Ms. Haukaas' motion to compel.

Ms. Haukaas also suggests a solution whereby she would not seek IME reports and data if Liberty Mutual gives up the opportunity to present Dr. McCall's opinion as a defense.  This request to exclude evidence is outside the scope of this discovery motion.  Furthermore, admissibility of expert opinions is a matter for the district court to determine, not this magistrate judge.

36

Accordingly, Ms. Haukaas' motion to compel a response to interrogatory five (the identities of all physicians who performed IMEs for Liberty Mutual and various affiliated entities) and interrogatory six (other information regarding the physicians identified in response to interrogatory five) is denied on relevance and proportionality grounds.  As for request for production eight, the court grants the motion to compel as narrowed.  Liberty Mutual is directed to redact all personal identifying information of claimants.  Liberty Mutual is further directed to redact all personal identifying information of the physicians who performed the IMEs except for the physicians' first, middle (where applicable), and last initials and the state where they practice.  The partial redaction of physicians' identifiers is calculated to protect their identities while enabling Ms. Haukaas to track how many times physicians were rehired after rendering opinions in favor of claimants.  The production of these IME reports is subject to the protective order already in place.  Docket Nos. 19 & 26.

## C.    Liberty Mutual's Motion for a Protective Order

In its response to Ms. Haukaas' motion to compel, Liberty Mutual makes an affirmative motion for a protective order to prevent Ms. Haukaas from serving it with additional unduly expensive and time-consuming discovery requests.  Docket No. 39.  The court has the authority to issue a protective order, upon a showing of good cause, to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  FED. R. CIV. P. 26(c)(1).  Such a protective order may, among other things, forbid the requested disclosure or discovery, forbid inquiry into certain matters, or limit

37

the scope of disclosure or discovery to certain matters.  FED. R. CIV. P. 26(c)(1)(A) through (D).  The district court has broad discretion in deciding whether the grant or deny a protective order.  Miscellaneous Docket Matter No. 1 v. Miscellaneous Docket Matter No. 2, 197 F.3d 922, 925 (8th Cir. 1999) (quoting Seattle Times Co. v. Rhinehart, 467 U.S. 20, 36 (1984)).

Before the court considers the merits of the motion for a protective order, it must consider a procedural challenge Ms. Haukaas has raised.  After Ms. Haukaas filed her reply in the normal course of briefing the motion to compel, Liberty Mutual filed a reply in support of its motion for a protective order.  Docket No. 48.  Ms. Haukaas has moved to strike this reply on the basis that it is an improper surreply to the motion to compel in violation of Civil Local Rule 7.1.  Docket No. 50.

Civil Local Rule 7.1 sets forth the principles for briefing schedules in this district.  It provides for an initial brief filed with a motion, a response brief filed by the non-moving party, and a reply brief filed by the moving party.  However, under Federal Rule of Civil Procedure 1, procedural rules "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."  FED. R. CIV. P. 1.

The court has reviewed the parties' submissions and concludes the facts and arguments presented by Liberty Mutual in its reply are not substantially new.  In the interest of facilitating a just, speedy, and inexpensive determination of this action, the court denies Ms. Haukaas' motion to strike

and will not order or grant leave to file further briefing on this discovery dispute, including on the issue of a protective order.

As for the motion for a protective order itself, the relief sought by Liberty Mutual has been substantially addressed by this court's determination of Ms. Haukaas' motion to compel. The court has denied Ms. Haukaas' motion to compel as to interrogatory three, which sought veil-piercing discovery. On the subject of interrogatory four, Liberty Mutual asked for a protective order limiting its scope geographically and in a manner consistent with the allegations in Ms. Haukaas' complaint. The court has already granted Ms. Haukaas' motion to compel as to interrogatory four in part, narrowed the subject matter based on relevance, and narrowed the window of time for which Liberty Mutual must respond. Accordingly, the court denies Liberty Mutual's motion for a protective order further limiting the scope of interrogatory four. And the court has denied Ms. Haukaas' motion to compel as to interrogatories five and six. Therefore, the court concludes there is not good cause to support the entry of a protective order further forbidding discovery into these areas.

However, a protective order covering disclosures of information from past bad-faith litigation and IME reports is in order. The court grants in part Liberty Mutual's motion for a protective order.

**D.   Attorneys' Fees**

Ms. Haukaas also asks the court for an award of costs and attorneys' fees for bringing this motion to compel under Federal Rule of Civil Procedure 37(a)(5)(A). That rule states:

(5) *Payment of Expenses; Protective Orders.*

(A) *If the Motion Is Granted (or Disclosure or Discovery Is Provided After Filing).*  If the motion is granted—or if the disclosure or requested discovery is provided after the motion was filed—the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising the conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the court must not order this payment if:

(i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;

(ii) the opposing party's nondisclosure, response, or objection was substantially justified; or

(iii) other circumstances make an award of expenses unjust.

FED. R. CIV. P. 37(a)(5)(A).  To satisfy this hearing requirement, the court "can consider such questions on written submissions as well as on oral hearings." FED. R. CIV. P. 37(a)(4) advisory comm. note to 1993 amendment (regarding Rule 37(a)(4), which has since been renumbered as Rule 37(a)(5)).

Rule 37(a)(5)(C) provides that, if a Rule 37 discovery motion "is granted in part and denied in part, the court . . . may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion."  FED. R. CIV. P. 37(a)(5)(C).  The district court has wide latitude in discovery and the appellate court reviews "discovery matters only 'for gross abuse of discretion resulting in fundamental unfairness in the trial of the case.' "  United States ex rel. O'Keefe v. McDonnel Douglas Corp., 132 F.3d 1252, 1258 (8th Cir. 1998) (quoting Prow v. Medtronic, Inc., 770 F.2d 117, 122 (8th Cir. 1985)).  Similarly, the appellate court only reverses a Rule 37 monetary award if the district court abused its

40

discretion.  Sentis Grp., Inc. v. Shell Oil Co., 559 F.3d 888, 889 (8th Cir. 2009)

(citing Int'l Bhd. of Elec. Workers, Local Union No. 545 v. Hope Elec., 380 F.3d

1084, 1105 (8th Cir. 2004)).

Here, the court has granted Ms. Haukaas' motion to compel responses to

specific discovery requests.  Therefore, Ms. Haukaas meets the first criterion of

Rule 37(a)(5)(A), and the court may consider apportioning reasonable expenses

for the motion.  And Ms. Haukaas first raised the issue of costs and attorneys'

fees in her second motion to compel.  See Docket No. 36 at p. 1.  Therefore,

Liberty Mutual had an opportunity to be heard when it responded in writing to

Ms. Haukaas' motion.

With these requirements satisfied, the court examines whether any of the

exceptions outlined in Rule 37(a)(5)(A)(i)-(iii) apply.  If none of the exceptions

apply, the court must award reasonable costs.  FED. R. CIV. P. 37(a)(5)(A).

First, Ms. Haukaas must not have filed the motion before attempting in

good faith to obtain the disclosure or discovery without court action.

Ms. Haukaas submitted to the court certification showing her attorneys'

attempts to resolve the discovery disputes without involving the court, and

defendants have not alleged any contrary facts or information.  Therefore, the

court finds that Ms. Haukaas did not file this motion to compel before

attempting in good faith to resolve its discovery disputes with Liberty Mutual.

Liberty Mutual has not identified reasons why its objections were

substantially justified or any other circumstances that make the award of

expenses on this second motion to compel unjust, and reasonable expenses are

41

required by Rule 37.  Ms. Haukaas is directed to submit an affidavit of her costs and attorneys' fees associated with this motion <u>as to the portions of the motion on which she prevailed</u> within 28 days of this order along with an accounting of attorney hours and description of what those hours represent in terms of attorney work.  Liberty Mutual shall have 21 days thereafter to file objections to the hours or amount of fees requested.  Ms. Haukaas will then have 14 days to file a reply if she wishes to do so.

## CONCLUSION

Based on the foregoing facts, law, and analysis, it is hereby

ORDERED that the motion to compel [Docket No. 36] filed by plaintiff Tonya Haukaas is granted as to interrogatory four (as narrowed) and request for production eight (as narrowed).  Defendant shall provide, within 15 days of the date of this order, a plan for providing information responsive to this request.  Plaintiff's motion to compel is denied as to interrogatories one, five, and six and request for production one.

ORDERED that the motion for a protective order is granted in part.  The court will enter a protective order that ensures the continued confidentiality of information and documents produced in response to interrogatory four and request for production eight.

ORDERED that Ms. Haukaas shall be entitled to reasonable costs and attorneys' fees for bringing this motion to compel.  Ms. Haukaas shall file an affidavit with proof of service setting forth the time reasonably spent on this motion attributable to the matters on which she prevailed, the hourly rate

requested for attorneys' fees and costs, and any factual matters pertinent to the motion for attorneys' fees within 28 days of this order.  Defendant shall file any and all objections to the allowance of fees within 21 days after receipt of service of Ms. Haukaas' motion and affidavit.  Defendant may, by counter affidavit, controvert any of the factual matters contained in Ms. Haukaas' motion and may assert any factual matters bearing on the award of attorneys' fees.  D.S.D. LR 54.1(C).  Ms. Haukaas shall have 14 days after service of defendants' response in opposition to file a reply.

### NOTICE OF RIGHT TO APPEAL

Pursuant to 28 U.S.C. § 636(b)(1)(A), any party may seek reconsideration of this order before the district court upon a showing that the order is clearly erroneous or contrary to law.  The parties have fourteen (14) days after service of this order to file written objections pursuant to 28 U.S.C. § 636(b)(1)(A), unless an extension of time for good cause is obtained.  See FED. R. CIV. P. 72(a); 28 U.S.C. § 636(b)(1)(A).  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Id.  Objections must be timely and specific in order to require review by the district court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 19th day of November, 2021.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge