## INDEPENDENT MEDICAL EXAMINATION
## SERVICE AGREEMENT

THIS AGREEMENT ("Agreement") is made and entered into effect as of the first day of May, 2011 (the "Effective Date") by and between ExamWorks, Inc., with a principal place of business at 3280 Peachtree Road, Suite 2625, Atlanta, GA 30305 (hereinafter referred to as "Vendor") and Liberty Mutual Insurance Company, with a principal place of business at 175 Berkeley Street, Boston, Massachusetts (hereinafter referred to as "LMIC").

### WITNESSETH

WHEREAS Vendor operates a managed care business which provides Independent Medical Exam Services, hereinafter referred to as "IME Services" and

WHEREAS LMIC desires to engage Vendor from time to time, to provide said services for the benefit of LMIC, its affiliates and subsidiaries and/or the benefit of its insureds and/or their injured employees; and

WHEREAS Vendor desires to provide such services or arrange for the provision of such services, pursuant to and in accordance with the terms of this Agreement;

NOW, THEREFORE, in consideration of the mutual foregoing promises and agreements made herein, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    "Days" shall mean business days unless otherwise stated.

1.2    "Injured Person" means an individual who is eligible under applicable state or federal workers' compensation and maritime laws, automobile insurance laws or other applicable insurance laws to receive benefits under a Policy or Plan.

1.3    "Employer" means an employer who maintains a workers' compensation Policy that is insured by LMIC or that maintains a self-funded Plan administered by LMIC.

1.4    "Network Provider" means any duly licensed health care provider (including a facility, Physician, or allied health care clinician) that has met the Vendor credentialing and re-credentialing standards and who is under contract with Vendor to provide services to an Injured Person as set forth in Exhibit A.

1.5    "Plan" shall mean an Employer's workers' compensation self-funded plan administered by LMIC.

1.6    "Policy" is an insurance policy issued by LMIC or its' affiliates.

1.7    "Services Fees" are those fees payable by LMIC to Vendor for the services performed by Vendor and as set forth in Exhibit B.

1

**EXHIBIT 2**

## ARTICLE II
## VENDOR SERVICES AND OBLIGATIONS

2.1 **Services.** Vendor shall select and make available Network Providers for the purposes of providing IME Services to LMIC and its affiliates and subsidiaries on a non-exclusive basis. IME Services shall include both independent medical examinations and related administrative support. Upon Vendor's receipt of a specific written request for an IME from a representative of LMIC, Vendor shall provide the IME and administrative support in connection with the IME, including but not limited to appointment scheduling, appointment notifications, medical report review, arranging multi-specialty exams, arranging travel accommodations, providing interpreters when necessary, as well as providing prompt reports in the format set forth in Exhibit A. Network Providers shall provide the following services as part of the IME:

a. Review of specific written request for services from representatives of LMIC and all available medical reports.
b. Conduct in-person meeting with the claimant to obtain the claimant's medical history.
c. Conduct physical examination of the Injured Persons' to assess and document signs and symptoms, range of motion, report of pain/discomfort, and other relevant findings.
d. Provide analysis of findings, formulation of conclusions, answers to each question posed by the requestor, and preparation of a signed written report.

2.2 **Authority.** Vendor represents and warrants that it has obtained all permits, certificates or licenses as may be required under applicable laws, rules and regulations to perform its obligations hereunder, and that all such permits, certificates or licenses shall be maintained during the term of this Agreement. If any additional permits, certificates or licenses become required under applicable laws, rules and regulations for Vendor to perform its obligations under this Agreement, Vendor will promptly obtain and maintain all such permits, certificates or licenses to ensure that, at all times during this Agreement, Vendor is properly authorized by law to perform its obligations under this Agreement.

2.3 **Contracting.** Vendor shall contract with all Network Providers that provide service to LMIC. Any agreement by which the Vendor delegates any function to a third party or non-Network Provider shall be presented in writing to LMIC for pre-approval. Vendor shall be solely liable for expenses incurred for services referred to Vendor that Vendor allowed a third party or non-Network Providers to provide, without LMIC's prior written approval. Failure to provide a request for these services in writing to LMIC for pre-approval may result in suspension or immediate termination of this Agreement by LMIC.

2.4 **Credentialing.** Vendor will credential all Network Providers prior to the commencement of Vendor's contractual relationship with them and on a bi-yearly basis while such relationship is in effect. Vendor shall provide proof of credentialing, in writing, on a bi-yearly basis to LMIC. Failure to provide such written proof may result in suspension or

2

immediate termination of this agreement by LMIC. Vendor's credentialing shall comply with all applicable laws and, at a minimum, entail verification through a source other than and unaffiliated with the provider that the provider has an unencumbered license to practice medicine and render medical care within any specialty in which the Vendor may ask the provider to provide services, has an acceptable malpractice history and is board certified in his/her specialty, if applicable and maintains levels of professional liability and/or medical malpractice insurance to the extent required by the laws of the state(s) in which such provider is licensed.

2.5    **Quality Assurance.** Vendor represents that it follows and will continue to follow throughout the term of the Agreement a program for monitoring the quality of services provided by Network Providers. The program shall contain written procedures to: remedy failure of any Network Provider to meet service criteria, to address complaints relating to the quality of service rendered by a Network Provider, and specify which service issues allow for termination, in whole or in part, of the agreement, which provides for Network Provider status.

2.6    **Network Composition.** Vendor shall maintain contracts with a sufficient number of Network Providers to ensure that the geographic and specialty coverage needs of LMIC hereunder are met. At LMIC's request, Vendor will use best efforts to negotiate with a specific provider or providers in a given geographic area that LMIC would like to have performed services pursuant to this Agreement. If Vendor is unable to secure the requisite pricing terms or the commitment levels desired by LMIC for each of the additional providers that LMIC may desire Vendor to contract with, LMIC will waive compliance with the service level expectations set forth in Exhibit A with respect to those providers if those providers agree to flat rate pricing acceptable to Vendor and LMIC. Vendor must obtain LMIC's prior written consent to this flat rate pricing before contracting these providers and prior to scheduling the exam. Notwithstanding the foregoing, nothing shall obligate Vendor to negotiate with or contract with a provider requested by LMIC to the extent any such provider would fail the credentialing standards required under this Agreement or otherwise cause Vendor to breach this Agreement, or Vendor has a reasonable belief that the use of such provider would cause a conflict of interest.

2.7    **Billing.** Vendor shall bill LMIC for services, as they are incurred, at the rates set forth in Exhibit B, Pricing and the terms set forth in Exhibit C, Billing Instructions. LMIC shall have no obligation to pay for service billed later than six (6) months from the date of service. Vendor billing practices shall vary based on the LMIC brand, claim type and referral mechanism. Vendor shall bill as set forth in Exhibit C.

2.8    **Reporting.** Vendor will electronically supply LMIC with semi-annual reports that provide data summarized for all LMIC companies, by LMIC strategic business unit, branch office and by line of business (Auto or Workers' Compensation). The following data shall be reported:

a. Number of total requests, broken down by iCaseManager™ versus non-iCaseManager™ referrals;
b. Average cost per exam;
c. Average additional costs per exam, by type of cost (e.g., diagnostic test, interpretation, transportation;
d. Date range of requests;
e. Average number of days from request to initial Liberty Mutual contact;
f. Average number of days from request to appointment scheduled;
g. Average number of days from request to appointment;
h. Average number of days from appointment to preliminary report, where permitted by law;
i. Average number of days from appointment to final written report;
j. Percentage of claims that satisfied performance expectations.

Data shall be provided to the contacts listed in Exhibit A only. Failure to provide such reports may result in suspension or immediate termination of this Agreement by LMIC.

2.9 **Insurance**. Vendor, at its sole expense, shall procure and maintain all insurance coverage required by applicable law and by customary business practices for the performance of Services. At a minimum, coverage shall include:

a. Workers' compensation insurance at statutory limits;
b. General liability insurance with limits of no less that $1 million per claims and $3 million in the aggregate, and
c. Errors & Omissions liability insurance with limits of no less that $1 million per claims and $3 million in the aggregate.

Once in place, no reduction in the amounts or type of the above coverage's shall be made without the written consent of LMIC. Vendor shall provide evidence of such insurance policies together with certificates of insurance thereof annually upon the renewal date of this agreement.

2.10 **Services are Advisory**. Vendor services are advisory in nature and accordingly Vendor or Network Providers shall not have authority or responsibility for determining who is eligible to receive any type of benefit, the amount of any benefit to be paid under any insurance Policy or Plan, or for eligibility determinations, claims processing, or employee payment determinations or other similar determinations. All such authority and responsibility for such determinations remain with LMIC. Nothing in this Section 2.10 shall be deemed to absolve Vendor and its Network Providers from the obligation to perform its services in accordance with the standards set forth in this Agreement or from bearing the responsibility for harm that may result from not adhering to such standards.

2.11 **Decisions re: Rendering Health Care Services**. Vendor and LMIC agree that notwithstanding the Services of Vendor provides under this Agreement, all decisions concerning the rendering of health care services are determined by the patient's physician, hospital or other health care provider and the patient. Vendor shall be

responsible for educating Network Providers not to directly communicate recommendations regarding health care services to an Injured Person. All determinations made by Vendor are recommendations only, and are not intended to be construed to require any person to have or forgo any medical treatment. Vendor Services are not substitutes for medical services.

2.12 **Secure Communication**. All communication from Vendor to LMIC will take place through secure means. LMIC has established a secure referral mechanism, iCaseManager, and offers additional types of secure messaging for e-mail communication. For all referrals from LMIC sent via iCaseManager™, Vendor agrees to meet the following technical requirements:

   a. Windows Operating System (Windows98 or higher)
   b. Internet Explorer (version 6.0 or higher)
   c. Adobe Acrobat Reader (version 4.0 or higher)
   d. An Internet connection (a high-speed connection is recommended)
   e. An Internet e-mail address (where iCaseManager™ sends all e-mail on referrals).
   f. **Referral Retrieval**: New referral requests to Vendor must be retrieved within 24 business hours of submission.
   g. **Appointment Scheduling**: All appointments shall be posted within 24 business hours of scheduling.
   h. **Report Submission**: The final report for each electronic iCaseManager referral must be returned electronically via iCaseManager™. The layout of the report shall be as set forth in Exhibit A. Vendor shall comply with all state regulations regarding the distribution of reports.
   i. **Report Header/Footer**: All electronic reports must either include the Vendor's logo and/or complete name and address, the Network Provider's complete name and address or, be prepared on state authorized forms, where applicable, and contain the medical professional/author's signature. Vendor shall comply with state regulations and/or the usual and customary practice of the jurisdiction. If the electronic report does not contain the Network Provider's authorized signature, a paper copy of the final report shall be mailed or faxed to the requester.
   j. **Report Technical Requirements**: The electronic reports submitted must be compatible with LMIC's technical environment (examples: Adobe PDF (Portable Data Format), MS Word, Rich Text Format). No report shall exceed 2MB in size.

2.13 **Process**. In accordance with Vendor's obligations hereunder, the IME process will generally consist of the following steps:

   a. Selection of the appropriate IME Network Provider based on specific medical specialty and/or LMIC request.
   b. Scheduling of appointment upon receipt of approval from referral source.
   c. Notice to all parties, per state regulation or LMIC direction, of scheduled appointment by letter, e-mail and/or telephone and through iCaseManager™. Appointment information shall include provider name, provider specialty, date, time and location of appointment.

IME Service Agreement

    d.  Follow-up with IME Provider concerning attendance at appointment.
    e.  Perform detailed quality assurance of IME reports.
         i.  Ensure evidence-based recommendations provided.
       ii.  Ensure IME reports are written in a professional, formal manner.
     iii.  Ensure the provider has answered all questions presented and details the basis for the answer and the reasoning supported by the review of medical records, patient interview, physical examination and evidence-based medicine.
    f.  Provide results of IME with a written IME Network Provider electronic report via iCaseManager. See Exhibit A for specific detail regarding IME report requirements.
    g.  Ensure compliance with state regulations regarding the above steps of the IME process.
    h.  Vendor shall also comply with all service level expectations as outlined in Exhibit A.

## ARTICLE III
## OBLIGATIONS OF LMIC

3.1    **Payment**. LMIC shall pay Vendor for services rendered at the rates set forth in Exhibit B within sixty (60) days of the date of receipt by LMIC of an undisputed invoice from Vendor. If any portion of an invoice is in dispute between the parties, LMIC shall be obligated to pay only the undisputed portion of the invoice within sixty (60) days of receipt of the invoice.

3.2    **Insurance**. LMIC, at its sole expense, agrees to keep in force comprehensive general liability insurance and professional liability insurance for the term of this Agreement. It is agreed that LMIC shall be deemed in compliance with this Section 3.2 by being self-insured.

3.3    **Responsibility for Policy**. LMIC shall retain full responsibility for all medical benefits, temporary and permanent disability benefits, death benefits, medical-legal responses, vocational rehabilitation, and any other expenses or services that are required to be paid or provided under Policies, Plans or applicable state and federal workers' compensation laws. LMIC shall retain full responsibility for all final determinations regarding compensability and the obligation of LMIC or any other person to pay for or otherwise provide Policy or Plan benefits, including workers' compensation benefits, to Injured Persons, including without limitation claims by or against Employers, Injured persons, members of a network, facilities or other health care service providers.

3.4    **Billing Discrepancies**. The parties agree to resolve any contract billing discrepancy (excess or deficiency) as soon as feasible, and shall make every effort to resolves issues within six (6) months from the date the billing discrepancy was identified by Vendor or LMIC. If requested by LMIC, Vendor agrees to provide to LMIC a certification by Vendor financial officer that, after due inquiry and to the best of his/her knowledge and belief, all billing discrepancies have been disclosed to LMIC.

## ARTICLE IV
## SERVICE FEES & PAYMENT TERMS

4.1   **Fees**. Vendor fees for Services rendered hereunder are based upon the fee schedule set forth in Exhibit B attached hereto, provided however, that at no time may Vendor bill or receive payment for services that exceed the allowable fees as per state-specific fee schedules and regulations. Vendor shall be liable for and responsible to reimburse LMIC for any state penalties, fines or expenses incurred by LMIC for bills submitted by Vendor and/or paid at fees that exceed allowable state fee schedules and regulations.

4.2   **Adjustments to Fees**. Vendor may request an adjustment of fees for the Services (1) year after the effective date of this Agreement and no more frequently than one (1) time per contract term. If Vendor deems it necessary to adjust fees, Vendor shall provide LMIC with sixty (60) days written notice of its desire to re-negotiate fees, the proposed fees and the business reasons for the proposal. Fee changes must be approved in writing by LMIC and shall be amended to this Agreement.

4.3   **Fees Related to Modification of Services**. Notwithstanding anything to the contrary contained in the fee adjustment procedures described in this Agreement or the fee schedule set forth on Exhibit B, any modification to Services may be accompanied by additional fees as determined by Vendor and approved in advance in writing by LMIC prior to initiation of such modification. Vendor shall not initiate any change in the Services type that results in additional charges without express agreement with the referring LMIC professional.

4.4   **Network Provider Payment.** Vendor shall make prompt payment to all Network Providers or non-Network Providers for services rendered in compliance with Vendor's contract with the Network Provider or non-Network Provider, provided that any payment shall be made no later than sixty (60) days of completion of the services provided under this Agreement or earlier date if required by applicable state law. In no event shall Vendor's payment to a Network Provider or non-Network Provider be contingent upon receipt by Vendor of payment for services from LMIC. Upon request, Vendor shall provide to LMIC proof of Network Provider or non-Network Provider payment. Vendor shall be responsible and liable for payment of any regulatory penalties or expenses, including litigation costs, for failure to comply with this Section 4.4.

## ARTICLE V
## PRIVACY OF PERSONAL AND MEDICAL INFORMATION

5.1   Except for the purposes of carrying out this Agreement, Vendor shall not disclose or use any non-public personally identifiable information of a customer or claimant (Customer/Claimant Information) provided by LMIC to Vendor. "Non-public personally identifiable information" is financial or medical information of or concerning a private person which either has been obtained from sources which are not available to the general public or obtained from the person who is the subject and which information is included

7

IME Service Agreement

in data files exchanged by the parties hereto. For the purposes hereof the terms shall include data elements such as names and addresses of individuals. Such Customer/Claimant Information shall not be reproduced or shared with any other party except those entities with which Vendor may from time to time contract in accordance with the fulfillment of the terms of this Agreement and which disclosure shall comply with all state and federal statutes and regulations governing the disclosure of medical records and non-public personally identifiable information, including any state or federal laws pertaining to the confidentiality of medical records that include diagnosis and treatment for HIV and psychiatric or substance abuse conditions and problems. Vendor shall promptly adopt and implement security procedures to protect from improper disclosure or use of Customer/Claimant Information, such procedures to comply with all applicable federal and state regulatory requirements.

5.2    When permitted by state or federal statute or regulation and/or pursuant to a state or federal law or regulatory board mandate, LMIC shall release complete copies of IME reports and/or release the name, the medical license number and other IME medical specialty information to appropriate parties.

5.3    If Vendor discloses any medical records or non-public personally identifiable information to LMIC, (i) LMIC shall not redisclose such records or information without valid authorization from the individual identified in the record or other information or as otherwise required or permitted by law and (ii) LMIC shall use the medical records, personal information or related data only for the purpose of evaluating and processing claims related to the claimant case.

5.4    Vendor shall during regular business hours and within thirty (30) days notice permit LMIC to perform security audits of Vendor's facilities and equipment, and such other audits as may be necessary to ensure Vendor's compliance with the terms and conditions of this Agreement, including but not limited to, all requirements related to the protection of Customer/Claimant Information, which audits shall be performed at LMIC's sole expense.

5.5    **Security Breach.** Vendor shall immediately notify LMIC if it detects an unauthorized actual, attempted or suspected disclosure of Customer/Claimant Information and/or breach of or intrusions into Vendor's computer systems or networks which may contain Customer/Claimant Information and shall respond to any security breach in accordance with the Data Security Requirements in Exhibit D, attached hereto and in accordance with any applicable state or federal laws.

5.6    Nothing in this Agreement shall be construed as prohibiting Vendor or LMIC from using data in medical records in a form that is not personally identifiable.

5.7    The parties agree that the obligations contained in this paragraph shall survive the termination of this Agreement.

8

IME Service Agreement

## ARTICLE VI
## CONFIDENTIAL AND PROPRIETARY INFORMATION

6.1  **Confidential Information.** Each party and its employees shall hold in strict confidence, and shall not disclose or permit the disclosure of any Confidential Information disclosed or delivered to it by the other party unless required by applicable law or as agreed to in writing between the parties. For purposes of this Agreement, the term "Confidential Information" shall include, but shall not necessarily be limited to, each party's trade secrets and any proprietary materials, tools, methodologies, and information including, but not limited to, case rates, provider reimbursement rates and related information, provider names, lists and directories whether in written or electronic form, underwriting methodology, proprietary rating plans, audit reports, actuarial analyses, electronic file formats, data, databases, database products, data compilations, format and design of reports, coding of data, suggested guidelines, formats and designs of data sheets and other intellectual property created or discovered in connection with providing services under this Agreement.

6.2  **Third Party Demand for Confidential Information.** The parties agree that if either party receives a request or demand for access to trade secrets and/or other Confidential Information from an unaffiliated entity or person not a party to this Agreement, the party receiving such request or demand shall promptly notify the other party in writing so that the other party may, at its own expense, exercise such rights as it may have to prevent or limit disclosure of its Confidential Information.

6.3  **Allowable Disclosures and Application of Article.** The obligations contained above shall not apply to any Confidential Information including, but not limited to, any ideas, know-how, concept or methodology, which: (a) is public knowledge at the time of disclosure; or (b) is approved for release by written authorization of the disclosing party.

6.4  **Remedies.** This Agreement shall not be construed to grant either party any licenses or similar rights to Confidential Information disclosed or delivered to it by the other party. Any breach by a party of its obligation under this Agreement may result in irreparable injury to the other party. In seeking enforcement of any of these obligations, a party will be entitled to seek injunctive and other equitable relief and damages, if ascertainable, in a court of competent jurisdiction to prevent, restrain, or recover damages for the breach of the Confidential Information provisions of this Agreement.

6.5  **Return of Confidential and Proprietary Information.** Within ten (10) days after a party receives a written request from the other party for the return of Confidential Information, the receiving party shall deliver all documents and other materials constituting such Confidential Information, including all copies, reproductions, extracts, and summaries of such Confidential Information in its possession, use or control.

6.6  **Survival.** The requirements of this Article shall survive the termination of this Agreement.

9

ARTICLE VII
BOOKS AND RECORDS

7.1    **Maintenance of Records**. Each party shall maintain such books and records necessary for the proper administration of this Agreement and for state and federal regulatory purposes and shall retain all such records for at least five (5) years, or if longer, the period required by law. The obligations set forth in this Article shall survive the termination of this Agreement.

7.2    **Exchange of Information**. LMIC agrees to cooperate with Vendor to implement various data and claims information transfer procedures to ensure the transfer of data, files and other documents necessary for the performance of this Agreement. LMIC will provide Vendor with documents and information requested by Vendor in a timely manner to meet any applicable state and federal reporting requirements. Each party shall provide to the other party on a timely basis such information and data as is required by the other party to comply with tax and accounting requirements. Such information shall be provided to the other party in accordance with procedures designed to protect the confidentiality of patient medical information and health care records in accordance with applicable state and federal law. Each party shall maintain, in accordance with generally accepted accounting principles consistently applied, financial and accounting records relating to services provided or paid for hereunder as shall be necessary and appropriate for the proper administration of this Agreement and payments to be made hereunder or in connection herewith.

7.3    **Audit Rights**. LMIC shall have the right, with thirty (30) days notice and during normal business hours, to conduct on the Vendor's premises if applicable, an audit and inspection of the Vendor's business processes, clinical quality of the IME Network Provider report charges and payments relating to the Agreement, to reproduce any documents, records, reports and data pertaining thereto and to utilize any of the foregoing on LMIC's premises in conjunction with LMIC audit software for purposes of completing the audit. LMIC shall have the right to conduct more frequent audits if deemed necessary to verify billings, payments and processes under the Agreement. LMIC agrees that, in performing any such audit, it will not unreasonably interrupt the Vendor's operations. In conducting any such audits, LMIC shall not be entitled to review any confidential or proprietary information of any third party without a valid release, except as may be permitted by state or federal laws. This right to audit, including access to the Vendor's premises and records, extends to LMIC internal and external auditors that shall be subject to approval by the Vendor, to governmental regulators having jurisdiction over LMIC or an interest in the Agreement and to third parties requested by LMIC to assist in any such audit. LMIC agrees to compensate the Vendor for the reasonable costs incurred by the Vendor in responding to LMIC's audit requests. Vendor agrees to cooperate with LMIC in any such audit and specifically in responding to government requests for information. Vendor shall promptly provide documents, records, reports and data requested by LMIC including those related to internal processes and external audit reports. Audit results will be communicated to the Vendor within 90 days of completing the audit. If changes are needed to the Vendor's business processes as a result of the

10

audit findings, LMIC and Vendor will discuss and develop a formal action plan. Failure to comply with the action plan may result in suspension or termination of this agreement.

## ARTICLE VIII
## TERM AND TERMINATION

8.1    **Term of this Agreement and Renewal.** This Agreement shall be effective as of the Effective Date, shall continue in full force and effect for one (1) year ("Initial Term"), and shall automatically renew for successive year terms unless otherwise terminated pursuant to this Agreement.

8.2    **Termination without Cause.** Either party upon at least ninety (90) days written notice may terminate this Agreement without cause.

8.3    **Breach of Agreement and Termination for Cause.** This Agreement may be terminated upon thirty (30) days written notice by either party in the event of one of the following events of default:

   a.  Failure to perform any material obligation under this Agreement in any material respect if said failure is not corrected by the defaulting party within the thirty (30) day notice period; or
   b.  If a party becomes involved in a voluntary or involuntary bankruptcy proceeding or otherwise becomes insolvent; or
   c.  The failure of either party to maintain any of the licenses, certifications or accreditation necessary to conduct the business required under this Agreement; or
   d.  A change in applicable state or federal law or regulation, by virtue of the adoption or amendment of statutes, rules or regulations or by administrative or judicial orders or decisions in a manner which significantly reduces or precludes either or both parties' ability to perform under this Agreement.

8.4    **Financial Obligations upon Termination.** Notwithstanding the termination of this Agreement, LMIC will remain fully liable to Vendor for all charges and Service Fees due in accordance with this Agreement for services performed prior to termination. LMIC will also remain fully liable for all mutually agreed upon charges and Service Fees due because of any transition services performed by Vendor on behalf of Company after the termination of this Agreement.

## ARTICLE IX
## INDEMNIFICATION AND ASSISTANCE IN LITIGATION

9.1    **Mutual Indemnification.** Each party to this Agreement indemnifies and agrees to hold harmless the other from and against all liabilities, claims, damages, causes of action, costs, and expenses (including, without limitation, reasonable attorneys' fees and related expenses) imposed upon, incurred by or asserted against the other party arising from (a) any material breach by the indemnifying party of the terms and conditions of this Agreement, (b) any negligence or intentional wrongdoing on the part of the indemnifying

11

party. In addition, the indemnifying party agrees to indemnify and hold the other party ("the Indemnified Party") harmless from and against all liabilities, claims, damages, cause of action, costs and expenses (including, without limitation, reasonable attorneys' fees and related expenses) imposed upon, incurred by or asserted against the Indemnified Party arising from any negligence, intentional wrongdoing or bad faith of any individual providing services under this Agreement, whether the individual is an employee of the indemnifying party, an independent contractor and/or Network Provider; (including, in the case of Vendor, of Vendor and its employees in performing the services hereunder), or (c) in the case of LMIC, any determination made under any policy or plan pursuant to Section 3.3; provided, however, that in each of the foregoing (a) through (c), the indemnifying party shall not be obligated to indemnify the indemnified party (the "Indemnified Party") pursuant to this sentence to the extent the liability, claim, damage, cause of action, cost, or expense (a) was caused directly by the Indemnified Party, (b) will be reimbursed to the Indemnified Party under insurance policies providing coverage to the Indemnified Party or (c) was not directed to the indemnifying party's attention within a reasonable time following notice to the Indemnified Party, provided the indemnifying party suffered material prejudice as a result of late notice.  In the event any action, suit or proceeding is brought against the Indemnified Party and the indemnifying party is required to provide indemnification pursuant to this Section, then the indemnifying party shall, at the option of the indemnifying party, either (i) engage attorneys approved by the Indemnified Party or its insurance carrier to defend the Indemnified Party or (ii) reimburse the Indemnified Party for the reasonable fees and expenses of legal counsel engaged directly by the Indemnified Party.  In the event that any penalties are imposed by the appropriate regulatory body, the indemnifying party shall indemnify the Indemnified Party under this section for any penalties imposed on the Indemnified Party based on the indemnifying party negligence, wrongdoing or bad faith.

9.2  **Vendor Assistance in Litigation**.  In the event legal or administrative action is brought against LMIC or any of its affiliates, relating in any way to LMIC's or any of its affiliates' denial of payment of a patients claim or to any other matter (i) upon the written request of LMIC, Vendor agrees to provide to LMIC, a copy of Vendor records relating to such patient and such claim; and (ii) upon mutual agreement by Vendor  and LMIC, or pursuant to a subpoena or discovery request served upon Vendor, Vendor shall use reasonable efforts to make available the requested documents and/or Vendor appropriate employee or consultant to assist LMIC or any of its affiliates in its defense of such claim or to testify in connection with the legal or administrative action according to pricing as set forth and described in Exhibit B; provided that LMIC shall reimburse Vendor for its reasonable out-of-pocket costs and expenses in complying with any such request or so assisting LMIC.

9.3  **Vendor Not an Insurer**.  LMIC acknowledges and agrees that Vendor shall have no responsibility or liability for any health care service decisions or payments.  LMIC agrees that Vendor is not and will not be directly or indirectly responsible for the payment from its own funds of any benefits due Injured Persons or any providers as assignees of Injured Persons.  LMIC acknowledges that Vendor is not an insurer, guarantor or underwriter of the responsibility or liability of LMIC to provide benefits pursuant to any Policy or Plan.

9.4    **Survival.** The requirements of this Article shall survive the termination of this Agreement.

## ARTICLE X
## MISCELLANEOUS

10.1    **Independent Contractor.** It is mutually understood and agreed that, in the performance of Vendor duties and obligations hereunder, Vendor is at all times acting and performing as an independent contractor. It is expressly agreed by Vendor and LMIC that no work, act, commission, or omission by or of either party, or such party's employees, agents, or servants, pursuant to the terms and conditions of this Agreement shall be construed to make or render either party (including its employees, agents, or servants), the employees, agents, or servants of or joint venture with the other, except that Vendor shall be deemed the agent of LMIC for the purposes of receiving and reviewing medical information and records of Injured Persons.

10.2    **Compliance with Laws.** The parties hereto agree to comply with all applicable laws and regulations in performing their responsibilities hereunder.

10.3    **Notices.** Wherever under this Agreement one party is required or permitted to give notice to the other, such notice shall be deemed given (i) when delivered in hand or (ii) when received by the other party after being sent by overnight courier service to the address specified below (return receipt requested) or by United States Mail postage prepaid by certified mail (return receipt requested) to the address specified below:

In the case of LMIC:                         With a copy to:

Tammy M. Camillone, Product Manager          Joanne C. Smith, Counsel
Liberty Mutual Insurance Company             Liberty Mutual Insurance Company
175 Berkeley Street                          175 Berkeley Street
Boston, MA 02117                             Boston, MA 02117

In the case of Vendor:                       With a copy to:

Wes Campbell, President                      Clare, Arguedas, General Counsel
ExamWorks, Inc.                              ExamWorks, Inc.
3280 Peachtree Road NE, Suite 2625           3280 Peachtree Road NE, Suite 2625
Atlanta, GA 30305                            Atlanta, GA 30305

Either party may at any time designate a different person to whom notice shall be given by delivering a written notice to that effect to the other party identifying such person and his/her address.

10.4    **Assignment.** Neither party may assign or delegate its responsibilities under this Agreement, except as specifically authorized hereunder, without the prior written consent

of the other.  Such consent shall not be unreasonably withheld, and shall be subject to the terms of this Agreement or other written agreement between Vendor and LMIC.  Any assignment or delegation attempted in violation of this provision shall be void and shall constitute cause for termination of the Agreement.

10.5 **Entire Agreement; Modification or Amendment**.  The parties acknowledge that upon execution of this Agreement, each other written agreement between Vendor or any subsidiary of Vendor (other than Medical Evaluation Specialists, Inc. d/b/a/ MES Solutions ("MES")) and Liberty for IME Services in effect as of the Effective Date (the "Prior Agreements") shall terminate and shall be of no further force and effect, and this Agreement shall amend and supersede each such Prior Agreement such that this Agreement shall govern the relationship between the parties with respect to all matters relating to IME Services whether arising prior to or after the Effective Date (except that (i) any services in process under Prior Agreements as of the Effective Date shall be invoiced and paid in accordance with the fee schedules and payment terms under such Prior Agreements, and (ii) any agreement between LMIC and MES shall continue in full force and effect).  Except as provided in the preceding sentence, this Agreement, including any Exhibits referred to herein and attached hereto, each of which is incorporated herein for all purposes, constitutes the entire agreement between the parties with respect to the subject matter hereof, and there are no representations, understandings or agreements relative hereto which are not fully expressed herein.  No amendment, change or discharge hereof shall be valid unless it is in writing and is signed by an authorized representative of each of the parties, as well as the written consent of State regulatory authorities if required.

10.6 **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of Massachusetts, without regard to conflict of law provisions.

10.7 **Force Majeure**.  Neither party shall be liable nor deemed to be in default of its obligations hereunder for any delay or failure in performance under the Agreement or other interruption of Service resulting, directly or indirectly, from acts of God, civil or military authority, act of the public enemy, war, accidents, natural disasters or catastrophes, strikes, or other work stoppages or any other cause beyond the reasonable control of the party affected thereby.  However, each party shall utilize it best good faith efforts to perform such obligations to the extent of its ability to do so in the event of any such occurrence or circumstances.

10.8 **Severability**.  The parties hereto agree and understand that if any part, term or provision of this Agreement is held by a court of competent jurisdiction to be illegal or unenforceable, the validity of the remaining portions or provisions of this Agreement shall not be effected, and the rights and obligations of the parties shall be construed and enforced as if this Agreement did not contain the particular part, term or provision held to be unenforceable.

10.9 **Use of Vendor Name and LMIC Name**.  During the term of this Agreement, LMIC shall be allowed to use the Vendor name as it relates to the services provided under this

Agreement.  Vendor shall be allowed to use LMIC name as it relates to the services rendered under this Agreement.

10.10   **Waiver**.  No delay or omission by a party hereto to exercise any right or power hereunder shall impair such right or power or be construed to be a waiver thereof.  A waiver by one of the parties of any of the covenants to be performed by another or any breach thereof shall not be construed to be a waiver of any succeeding breach thereof or of any other covenant contained herein.

10.11   **No Third Party Beneficiaries**.  No individuals or entities other than the parties to this Agreement are intended by the parties to be third party beneficiaries to the Agreement, except as otherwise provided herein, and this Agreement shall not be construed or interpreted to confer rights or benefits on any third party and shall not be enforceable by anyone not a party to this Agreement.

10.12   **Exhibits**.  All exhibits and attachments referenced in this Agreement are incorporated herein as though set forth in full.  If any provision of this Agreement conflicts with any Exhibit to this Agreement, this Agreement shall control with respect to the subject matter of such Exhibit.

10.13   **Injunctive Relief**.  Vendor and LMIC each acknowledge that in the event of a breach of certain sections of this Agreement, including, without limitation Sections 5 and 6, Vendor or LMIC, as the case may be, may not have an adequate remedy at law and will suffer irreparable damage and injury.  Therefore, in addition to any other remedy available, Vendor and LMIC each agree that if it violates any of the provisions of Section 5 or 6, the non-breaching party shall be entitled to seek injunctive relief by a court of competent jurisdiction.

10.14   **Captions & Headings**.  The headings, titles and captions of the sections of this Agreement and the Exhibits and Attachments are inserted only to facilitate reference, and they shall not define, limit, extend or describe the scope or intent of this Agreement or any provision hereof or any Exhibit or Attachment hereto, and they shall not constitute a party hereof or affect the meaning or interpretation of this Agreement or any part hereof.

10.15   **Non-Exclusive Agreement**.  This Agreement is not intended to be exclusive and shall not be deemed exclusive.  Both LMIC and Vendor shall remain free to contract with other entities or persons with respect to the type of activities covered under this Agreement.  Nothing herein shall prohibit LMIC from obtaining similar services from another vendor or performing such services "in-house" nor shall LMIC be obligated to give Vendor any minimum volume of business hereunder.

10.16   **Good Faith Discussions**.  The parties hereto agree to meet and confer in good faith to resolve any problems or disputes that may arise under this Agreement.

IME Service Agreement

IN WITNESS WHEREOF, Vendor and LMIC have caused this Agreement to be executed by the persons authorized to act in their respective names.

Liberty Mutual Insurance Company

By _____

George Neale
[ N a m e ]

Executive Vice President
[Title]

4/13/2011
[Date]


ExamWorks, Inc.

By _____

Wes Campbell

[ N a m e ]

President
[Title]

4/19/2011
[Date]

16

## Exhibit A

## Service Level Agreement

**I.    General Overview** Vendor will provide independent medical exam services as provided for herein and requested by LMIC pursuant to the terms and conditions of this Agreement.

### 1.  Special Service Requests
Some independent medical exam requests may require specific service handling based upon the nature of the claim.  If service-handling instructions conflict with the terms of this agreement, Vendor shall contact LMIC to confirm services required.

### 2.  State Regulations
Specific state mandates may supersede these guidelines.  Before providing service, Vendor shall contact LMIC should changes in state regulations conflict with the terms of this agreement. Additionally, at no time may vendor bill for services that exceed the allowable fees as per state-specific fee schedules and regulations.  The state fee schedule supersedes the price list, fees and rates set forth in Exhibit B.  Vendor shall be liable for and responsible to reimburse LMIC for any state penalties, fines or expenses incurred by LMIC for bills submitted by Vendor and/or paid at fees that exceed allowable state fee schedules and regulations.

### 3.  Independent Medical Examiner Employment Status
Vendor's independent medical examiners shall be employees or independent contractors of Vendor. Subcontracting of services is explicitly prohibited.

### 4.  Active Practice
All independent medical examiners must be in active practice.  LMIC has defined this requirement as follows:

a.  Examiner must have at least 5 years of clinical practice experience.
b.  Examiner must provide patient care for at least eight hours per week, or have been engaged in active practice for at least eight hours per week within the past 5 years.
c.  Active practice, for a surgeon, need not include the performance of surgery, but does need to include patient care requirement above.
d.  Exceptions to this rule may be made provided the vendor submits an exception request in advance of assigning a referral to an examiner.

### 5.  IME Network Composition
Vendor will provide, on at least a bi-annual basis, a provider listing for those states in which the vendor is assigned.

### 6.  Hours of Operation
Vendor's core business hours will be 8:00 AM – 5:00 PM, in their local time zone, Monday through Friday, unless otherwise mandated by state law.  Any exceptions to this requirement must be approved in writing by LMIC and shall not impact the due date and time for returned reports.

17

**Exhibit A**

**Service Level Agreement**

7. <u>Standard Specialty</u>
Vendor shall assign an IME examiner of the specialty requested by LMIC. No substitutions may be made without LMIC requestor advance consent. If upon receipt of a specialty request Vendor has concerns about the appropriateness of said specialty, Vendor shall contact LMIC requestor to discuss.

8. <u>Licensure Requirements</u>
IME examiners must hold a valid license in any of the states of the US., preferably in the jurisdiction for which they will be conducting exams.

9. <u>Referral Mechanism</u>
All workers compensation referrals must be received through iCaseManager™. If vendor receives telephonic or facsimile referrals, Vendor shall redirect the requestor to iCaseManager™.

10. <u>Cover letters</u>
Vendor is not responsible for, and is prohibited from, drafting cover letters to be provided to the examiners. If deemed necessary, the LMIC requestor will draft a cover letter.

11. <u>Draft reports</u>
Vendor shall not provide draft reports, either in iCaseManager™, e-mail or through other means. Only final reports shall be shared with LMIC. If changes are needed, either typographical or requests for additional commentary, these should be provided in a formal addendum

12. <u>Communication</u>
All communication relative to referrals shall take place in iCaseManager™. E-mail shall not be used.

**II.     Performance Timelines.** Vendor shall perform IME services pursuant to this Agreement according to the following time frames and performance guarantee, except as otherwise required by applicable state or federal law, or as directed by the LMIC requestor:

1. The average number of days from request of service to initial LMIC referral source contact shall not exceed one business day.

2. Upon receipt of approval by LMIC referral source to schedule appointment, the average number of days from request of service to scheduling of appointment shall average one business day and shall not exceed five business days, without prior approval from LMIC referral source for a longer time frame.

3. The average number of days from request of service to appointment shall not exceed twenty-one business days without prior approval from LMIC referral source for a longer time frame.

4. The average number of days from appointment to verbal preliminary report, where allowed by law, shall not exceed ten business days.

18

## Exhibit A

### Service Level Agreement

5. After completion of evaluation, the average number of days from appointment to final written report shall not exceed fourteen business days without prior approval from LMIC referral source for a longer time frame.

6. LMIC shall measure these results via iCaseManager reporting.

**III.    Report Layout.** All IME reports shall be have a professional layout and include, at a minimum, the following items, listed as headers within the report:

1. Reason for the exam – A statement regarding the purpose of the IME referral. The IME physician might start the report with a statement such as "I've been asked to assess John Smith in regard to his ability to return-to-work."

2. Summary of case facts presented in LMIC referral, medical records and injured worker.

   a. History of the present condition

   b. Past medical history including medications and allergies

   c. Past surgical history

   d. Social history

   e. Occupational history

   f. Documentation of all clinical information and/or medical records presented by LMIC to include dates of reports.

   g. Radiographs, if performed as part of the IME service, and clinical findings presented in same.

   h. Detailed documentation of all specific issues discussed with injured worker. Should address any conflicts in verbal discussion with medical records provided. Should also document any supplementary medical records provided by injured worker.

3. Physical Examination – Include detailed findings as well as provide clinical commentary regarding the claimant's response to examination techniques and the appropriateness of the response.

4. Impression – The IME physicians overall assessment of the claimant's diagnosis. Detailed discussion of recommendations to include:

   a. Clinically appropriate reasoning to support recommendations, based on facts presented/documented.

   b. Appropriate supporting guideline used for recommendation, such as ACOEM, ODG, etc., if applicable.

**Exhibit A**

**Service Level Agreement**

c. Relationship between recommendation, guideline and evidence is clearly stated, if applicable.

**IV.    Vendor Incidents**  From time to time LMIC/LMMC may identify clinical quality, customer service or billing issues with a Vendor service. These issues or "incidents" shall be screened internally by LMMC Product Managers to remove duplicates and ensure merit. Once merit is established, the incident will be forwarded to the Vendor for resolution. To ensure a secure and efficient communication process, these incidents will be processed through LMIC's proprietary extranet site, iCaseManager™ in accordance with the following requirements.

1. General
All communication between LMIC and Vendor relative to incidents shall take place through secure means. LMIC has established a secure communication mechanism, iCaseManager™, for this purpose.

2. Operational
*Incident Retrieval:*
New incident requests submitted via the Vendor Incident Form (VIF) must be retrieved within 24 business hours of submission.

*Incident Resolution:*
It is expected that all incidents will be resolved in a timely manner. Generally speaking, all incidents shall be resolved within 5 business days. If the incident cannot be resolved within this time frame, an action plan for a resolution must be submitted within 5 business days with an expected resolution date. The Product Manager will advise if the action plan is appropriate or needs to be amended.

*General Communication:*
Within iCaseManager™, there is an Add Note feature for free form comments. This functionality shall be used for communicating information directly to the Product Manager. This functionality shall be used in lieu of e-mail to ensure confidentiality and document all communication on the nomination.

*Performance:*
Incident tracking and resolution will be a key measure of Vendor performance. Failure to comply with the above process, turn-around-time and documentation may result in reduced referral volume and/or termination of the relationship.

20

**Exhibit A**

**Service Level Agreement**

## V.    LMIC Contacts

| Reason | Name | Phone | E-mail |
|---|---|---|---|
| Referral-specific Issues and Questions | iCM Requester | See iCM referral form | See iCM referral form |
| iCM Technical Issues | iCMVendorAdmin | N/A | iCMVendorAdmin@LibertyMutual.com |
| Billing and Payment Issues | IMEVendorBilling | N/A | IMEVendorBilling@LibertyMutual.com |
| Contract Changes | Tammy Camillone | 617-654-3978 | Tammy.Camillone@LibertyMutual.com |
| iCM Vendor Incident Forms (VIFs) | iCM Requester | See iCM VIF form | N/A |
| | Chris Krueger | 715- 847-8180 | Christopher.Krueger@LibertyMutual.com |
| Operational Matters | Tammy Camillone | 617-654-3978 | Tammy.Camillone@LibertyMutual.com |
| Semi-annual reports | IMEVendorBilling | N/A | IMEVendorBilling@LibertyMutual.com |
| Billing | IMEVendorBilling | N/A | IMEVendorBilling@LibertyMutual.com |

21

## Exhibit C

## Billing Instructions

Vendor agrees to bill LMIC at approved rates. Vendor shall provide this provider level rate information in an MS Excel file with the following layout:

Last Name
First Name
Specialty
Address 1
Address 2
City
State
 Zip
Vendor Type
Pricing Jurisdiction
Standard Price
No-Show Price
Cancellation Fee

This data will be input into iCaseManager™ for rate audit purposes.

At no time shall fees exceed allowable fees as per state-specific fee schedules and regulations. If fees exceed the allowable amount, state fee schedule rates will be applied by LMIC and will be accepted by the Vendor. Vendor shall be liable for and responsible to reimburse LMIC for any state penalties, fines or expenses incurred by LMIC for bills submitted by Vendor and/or paid at fees that exceed allowable state fee schedules and regulations. Additionally, the LMIC requestor of services must approve any fees in excess of the contracted rates in advance of the service provided.

Any change in the independent medical exam service that results in additional charges shall not be initiated by Vendor without express agreement with the LMIC requestor.

IME rates include up to one and a half (1.5) hours of independent medical examiner time unless otherwise specified. If it is expected that IME shall exceed one and a half (1.5) hours of examiner time, the LMIC requestor shall be notified in advance on any additional fees. Vendor shall obtain authorization for any additional fees in writing, preferably in iCaseManager™.

22

## Exhibit C

## Billing Instructions

Per Article 2.7, Vendor billing practices shall vary based on the LMIC brand, claim type and referral mechanism.

1.    For worker compensation referrals for Liberty Mutual Commercial Market and LibertyNorthWest brands received through iCaseManager™, the following data elements shall be captured and submitted as an MS Excel spreadsheet for billing purposes.

Referral Date
Claim Number
Market
Claimant Name
Claim Jurisdiction
Claim Type
Service Type
Appointment Date
Report/Addendum Upload Date
IME is Requested as?
Provider (Last, First)
Specialty
Charge
Vendor Invoice Number
CPT Codes
iCM Referral Number

Each column in the Excel spreadsheet shall use the exact column name indicated above as the header row, in the correct order. All data elements shall reflect the referral data on the iCaseManager™ referral and comply with centralized billing instructions given under separate cover.

Additionally, each Excel spreadsheet must contain the following Vendor-identifiable information in the header:

- Vendor Name
- Vendor Address
- Vendor City, State ZIP
- TIN

At no time may vendor bill for services that exceed the state fee schedule. The state fee schedule supersedes Exhibit B.

Billing should be submitted electronically to IMEVendorBilling@LibertyMutual.com on a monthly basis. Additional information pertaining to centralized billing is provided under separate cover.

2.    For auto/liability referrals for all LMIC brands and worker compensation referrals for other than Liberty Mutual brands, Vendor shall bill the requestor directly in the local branch office. This requirement applies regardless of whether the referral was sent via iCaseManager™ or through other means. The invoice must contain the following information:

23

## Exhibit C

## Billing Instructions

    a.  LMIC company name, strategic business unit and branch office name (e.g., Liberty Mutual, National Market, Tampa Office)
    b.  LMIC claim number
    c.  Name of LMIC requestor of services
    d.  Date of service
    e.  Invoice number
    f.  Vendor case number
    g.  Service type (IME, no-show, cancellation)
    h.  Vendor fee (per Exhibit B)
    i.  Provider name
    j.  Provider specialty

3.  Vendor may bill for additional expenses in connection with performing Services hereunder only after pre-approval has been obtained by LMIC for said expenses. Such expense may include diagnostic tests, interpretation and transportation services. Invoices shall be directed to the LMIC branch office that requested the relevant services and must contain the following information:

    k.  LMIC company name, strategic business unit and branch office name (e.g., Liberty Mutual, National Market, Tampa Office)
    l.  LMIC claim number
    m.  Name of LMIC requestor of services
    n.  Date of service
    o.  Invoice number
    p.  Vendor case number
    q.  Service type (diagnostic test, interpretation, transportation)
    r.  Vendor fee (as agreed to by the LMIC requestor)
    s.  Provider name
    t.  Provider specialty

24

## Exhibit D

## Data Security Requirements

1.  Vendor shall adhere to the security measures set forth in the Data Security questionnaire submitted to LMIC.

2.  Vendor shall provide the following in relation to data security:

     a.  User Identification and access controls designed to limit access to LMIC Data to users authorized by LMIC;

     b.  External connections to the World Wide Web that have appropriate security controls including industry standard counter measures that will detect and terminate any unauthorized activity prior to accessing applications maintained by Vendor;

     c.  Industry standards firewalls regulating all data entering Vendor's internal data network from any external source which will enforce secure connections between internal and external systems and will permit only specific types of data to pass through;

     d.  Industry standard encryption techniques that will be used when LMIC data and electronic forms of LMIC data is transmitted by Vendor;

     e.  Physical Security measures, including securing all LMIC data on a secure server, in locked data cabinets within a secure facility. Only authorized Vendor employees and agents will have physical access to such information;

     f.  Regular employee training regarding the security and data recovery programs referenced in this Section;

     g.  Regular testing of the systems and procedures outlined in this Section;

     h.  Audit controls that record and monitor software and services activity continuously;

     i.  A fully implemented security incident plan (the "Security Incident Plan") covering without limitation, how Vendor will detect and respond to all unauthorized actual, attempted or suspected breaches of or intrusions into Vendor's computer systems or networks, and how Vendor will notify LMIC of same in compliance with applicable laws. Vendor shall submit its Security Incident Plan to LMIC for approval, and will revise such plan to meet specifications provided by LMIC.

     j.  Vendor agrees that at LMIC's request and without charge it will encrypt data that is financial related data, and all personally identifiable information of all customers, claimants, employees, contractors and agents of LMIC that is stored and/or transmitted using Vendor's computer systems and networks. Vendor shall use such encryption methods and key strengths as are required by LMIC.

3.  Vendor will maintain and follow a disaster recovery plan designed to maintain LMIC's access to the software and services, and to prevent the unintended destruction of LMIC's data, which plan, unless otherwise specified herein, shall provide for twice-daily back-up of LMIC data and archival of

25

## Exhibit D

## Data Security Requirements

such LMIC data at an off-site secure facility. The disaster recovery plan shall provide for and be followed by Vendor such that in no event shall software and services , and/or LMIC data be unavailable to LMIC for a period in excess of the time-frame noted in Vendor's disaster recovery plan. Vendor's disaster recovery plan is attached as Exhibit E.

**Exhibit E**

**Vendor's Disaster Recovery Plan**

*ExamWorks POLICY AND PROCEDURE*

Policy Number: 13

Effective Date: 01/10/2010

Revision Date: 11/01/2010

**SUBJECT:** Disaster Recovery Plan for Independent Review Cases

**SCOPE:** All Departments

**POLICY:**
The Disaster Recovery Plan Policy & Procedure was developed to ensure that, in the event of a major interruption of ExamWork's services, the Independent Review cases will continue to be tracked and completed in accordance with the URAC or State standards.

**PURPOSE:**
The purpose of this P&P is to ensure that all Independent Review cases that are being processed at ExamWorks, will be tracked and completed in accordance with all applicable regulations in the event that a major interruption of ExamWorks services occurs. This interruption can be due to, but not limited to, severe weather related office closings, severe and long-term power outages, severe and prolonged disruption of electronic communication.

**PROCEDURE:**
In the event that ExamWorks office is inaccessible for a minimum of two business hours, the following operational plan will be instituted per the CEO directive:

The Informatics Director will pick up the backup tape at the designated off-site location.
The tape will be brought to the designated off-site server for installation of most recent client history and information.
The emergency call tree will be activated by the IT Director.
The remote team for each division will notify the client contacts on the log sheet that a disaster has occurred and that the ExamWorks office is or will be closing.

**NEW CASES:**

- If there is phone service, but no other service, the office automated attendant will inform callers that the office is closed due to a disaster. The message will inform the caller how long the office will be closed (if it is known). Callers will be allowed to leave a voice mail message.
- The Executive Administrative Assistant will check the voice mail remotely at a minimum of 3 times per day during business hours.
- If a client has left a voice mail message, that information will be relayed to the Department Lead for follow up. If a physician consultant has left a message, that message will be relayed to the Physician Credentialist

27

**Exhibit D**

**Data Security Requirements**

- If a case needs to be done on an expedited basis, the Department Lead and the Physician Credentialist and the Medical Director will determine if medical records can be sent directly to a physician consultant. If so, the Department Lead will call the client and provide the information as to where to send the medical records. A record of this conversation will be documented.
- The Physician Credentialist will contact the physician consultant and provide him/her with information regarding the case.
- The reviewer, after receiving the file, will perform the review and dictate as per standard operating procedure.
- When dictation is complete, the physician consultant will notify the Physician Credentialist, who will contact the Executive Administrative Assistant to get the transcription from the transcription company.
- The report will be sent to the Team Lead via email for QA.
- The Team Lead will email the final report to the client.
- All information will be dated and timed so that the information can be logged into the system later.
- The disaster recovery plan will be tested at least every two years.

## EXISTING CASES:

- If there is a message on the phone from a client trying to locate a report, the Executive Administrative Assistant will forward the message to the Department Lead.
- The Department Lead will contact the client to see if the turnaround time can be extended. If not, the Department Lead will contact the Executive Administrative Assistant.
- The Executive Administrative Assistant will get the transcription from the transcription company.
- The report will be sent to the Team Lead via email for QA.
- The Team Lead will email the final report to the client.

If there is a major interruption in all of ExamWork's services, including the phone system, the Department Lead will make every effort to contact all of ExamWorks major clients to inform them of the situation.

28